IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Marion T.D. Lewis, individually and on behalf
of all others similarly situated,

Case No.

_____

ECF Case

Plaintiff,

CLASS ACTION

-v-

COMPLAINT AND
DEMAND FOR INJUNCTIVE
AND DECLARATORY RELIEF

DEMAND FOR TRIAL

The Government of England and the United Kingdom;
and the Institution of the British Monarchy or "The
Crown," (Attn: Rt Hon Victoria Prentis MP  in her
capacity as Attorney General for the United
Kingdom and the Monarchy or "Crown"; and
Michael Tomlinson in his capacity as Solicitor
General of the United Kingdom and Crown),

Defendants.

_____

## NATURE OF ACTION The Plaintiff

1.      Plaintiff, individually and on behalf of all others similarly situated for her

action for declaratory relief, injunctive relief, and damages against the Defendants,

brings this case because the Defendants have conspired with others in unlawful

commercial activities to deprive her and others of their constitutional right to know

who they are, where they came from, and what their ethnic origins are, and have failed

to help her and others similarly situated with re-establishing their identities in violation

of the 14th Amendment of the United States Constitution, Title 18 Section 241 of the United States Code, as well as other United States and international laws and conventions.

2.  The Plaintiff individually and on behalf of all others similarly situated, asserts that for more than 200 years, through their statutory and apparent authority, the Defendants – the Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the Institution of the British Monarchy–aided and abetted private commercial actors and enterprises in unlawful commercial operations that involved kidnapping innocent, undefended civilians **who had committed no wrongdoing**, and, among other harms, imprisoning these undefended civilians on worksites called plantations, and erasing the identities of these undefended civilians, including their names, origins and ethnic nationalities, in a manner that was completely arbitrary, reckless, negligent and grotesque.

3.  The Plaintiff was born in Antigua and Barbuda, a tiny country in the Caribbean which was colonized in 1632 by British settlers according to historical records and which has been regarded as part of the British Commonwealth for more than three centuries. While the country is now technically "independent" the British sovereign is still its head of state.

4.  The Plaintiff, based on information and belief, believes the Defendants have maintained dominion and control of Antigua and Barbuda since the 17th Century. Originally, the Defendants used the island and its sister island Barbuda as a "slave-breeding" colony where they forced the Plaintiff's ancestors and countless others to

enter into forced reproductive activities to create new humans for exploitation; the Defendants also used it as a colony where they engaged in, participated in, and/or permitted private citizens to engage and participate in, law-breaking commercial activities, practices and conspiracies such as unlawfully kidnapping innocent undefended civilians from the African continent—some of whom were the antecedents of the Plaintiff—forcibly migrating them to the Antigua (and other Caribbean islands), and arbitrarily dispossessing these civilians of their identity and origin (and other rights) as a matter of routine, without due process of law, until 1834.

5.  The Plaintiff comes from a long line of people on both her maternal and paternal sides, all born in Antigua, who do not know their ethnic origin as a consequence of the Defendants' commercial activities, practices, and conspiracies.

6.  The Plaintiff's domicile is New York, while others similarly situated, i.e., people of Caribbean heritage (Antiguans, and others) who are likewise part of the British Commonwealth and do not know their ethnic origin—and this number is approximately 10 million according to the Plaintiff's estimates—are domiciled elsewhere.

7.  The Plaintiff asserts that the Defendants are responsible for the fact that she does not know her origins and where she came from. She asserts that the Defendants' agents, representatives, and subjects, unlawfully interfered with the identities and origins of millions of undefended civilians--some of whom were her antecedents--while the Defendants were conducting or permitting unlawful commercial activities, practices, and conspiracies to be conducted outside the United States during the period called

"slavery."[1]

8. The Plaintiff asserts that the Defendants' participation in conspiracies against the rights of her antecedents, and the Defendants' unlawful interference with her antecedents' rights, have led to the loss of identity and information about her ethnic origin; and the Plaintiff asserts that the same is true for millions of other people like the Plaintiff who to this day have no idea where they come from because their identity rights have likewise been unlawfully interfered with by the Defendants.

9. The Plaintiff asserts that the Defendants' unlawful interference with her antecedents' identities and origin, and that of other similarly situated people from the British Commonwealth in the Caribbean, has led to other adverse effects—including emotional distress—on the Plaintiff and others similarly situated who are domiciled in the United States, in the Caribbean, and elsewhere.

10. The Plaintiff asserts that the Defendants' unlawful interference with the identities of her antecedents, and those of others similarly situated, has erected a system of "structural racism" in the global society that normalizes and trivializes the loss of identity of millions of people like the Plaintiff whose fundamental right to know who they are, where they come from, and what their origins are, has been summarily dismissed and is being disrespected, in real time, because of their race; because they were born in small islands in the Caribbean which are thought to have been "colonized" by the powerful Defendants and which therefore have no political clout on

---

[1] This period, according to historical records, began sometime in the mid-16th Century and continued until on or about 1833 when these commercial activities were officially outlawed.

the global stage; and because they are descended from people who were racially abused, dehumanized, and toxically defined by the Defendants.

11. The Plaintiff  asserts that the Defendants have done wrong here, and she believes the Defendants have a legal and moral obligation to help with re-establishing the identities and origins of millions of people like her whose antecedents were wrongfully and arbitrarily dispossessed of their identities and origins in violation of existing law and without due process, because neither the Plaintiff, nor others similarly situated, nor their antecedents, have committed any wrongdoing to warrant being deprived of their identities and origins even for one day, never mind for perpetuity.

12. The Plaintiff further asserts that the Defendants' unlawful commercial activities (which were part of a multi-national network that conspired to deprive millions of people of their rights), as well as the practices that went with these unlawful commercial activities and conspiracies--such as dispossessing only certain individuals of their identity and origin, and color-coding millions of individuals as one color even though each individual has his or her own unique complexion and color--has laid the foundation for "structural racism" to take root and cement itself into a norm in the global society, to the detriment of people similarly situated to her.

13. The Plaintiff asserts that by arbitrarily dispossessing her antecedents of their identities and origin without due process of law; imprisoning them on plantation worksites for over three centuries to provide lifetime labor without even a symbolic dollar of pay even though they had done nothing wrong; and refusing to this day to assist with re-establishing the lost identities of their progeny, the Defendants de-humanized her antecedents, and as a consequence have exposed the Plaintiff and others similarly

situated who are associated with them (their descendants) to "structural racism" where their basic rights, including and especially their right to know their origin and identity, are disrespected as a matter of routine.

14. The Plaintiff further asserts that structural racism has led to desensitization where the average person in the global society no longer realizes the wrongness of certain accepted norms; and she asserts that this system pits people against each other based on their race in the society, and advantages, privileges and favors one race based on their coded color, over the other, and creates inappropriate binaries and dichotomies, and a false "oppositional" relationship between two groups of people in society, such that even basic rights, like the right to an identity and the right to know one's origin are determined by these dichotomous and inaccurate color codes, which in turn are determined by the perceived generalized place of origin of at least one of the individual's antecedents.

15. The Plaintiff asserts that this structural racism has stood in the way of people like her achieving justice regarding their rights stemming from these unlawful commercial activities, practices and conspiracies, which, in effect, were human rights abuses perpetrated against her antecedents and millions of others, that has led to human rights abuses against her, and others similarly situated.

16. The Plaintiff wants to know her origins because she believes she has a fundamental constitutional right, like others more privileged and favored in society, to know her ethnic origins.

17. The Plaintiff asserts that she and others similarly situated need to have DNA and forensic and genetic genealogical testing to begin to unpack their true identities and origins and she believes the Defendants should pay for these tests.

18. The Plaintiff asserts that the Defendants should pay for the DNA testing that she and others similarly situated need to re-establish their *identity* and *origin* because the Defendants' unlawful commercial activities outside the United States is the reason they do not know their identity and origin. That is to say that the identities and origins of the Plaintiff and others similarly situated were erased as a consequence of the Defendants' participation in unlawful conspiracies, which were commercial in nature and scope. The Defendants and the Defendants' subjects, agents and representatives, unlawfully trafficked, sold, exiled, imprisoned and arrested the antecedents of the plaintiffs in, on, and from the African continent, and arbitrarily dispossessed these innocent undefended civilians --who had done nothing wrong--of their identities and information about their origin as a matter of routine in contravention of existing laws, which were in force at the time, and which, outrageously and incredibly, were promulgated by the Defendants themselves.

19. The Plaintiff asserts that at all times commencing at or about the early 16th Century and continuing to the current day, the Defendants and their subjects, agents and representatives knew that dispossessing innocent civilians of their identities and origin as a matter of routine was, and is, against British law but that they went ahead and dispossessed, and/or allowed her antecedents and others similarly situated to be dispossessed of their identities and origins, anyway, when they shipped or force-bred her antecedents to or in slave-breeding colonies in the Caribbean; and she asserts that

dispossessing these innocent civilians of their identities and origin, and forcing their progeny to live without knowing their origins when none of them have committed any wrongdoing to warrant these types of punishments, is to abuse the human rights and constitutional rights of each person who is subjected to this dispossession.

20. The Plaintiff further asserts that it was, or should have been foreseeable to the Defendants and all concerned that dispossessing innocent civilians of their identities and origin as a matter of routine would cause future generations of these civilians to suffer identity losses; and she further asserts that the Defendants went ahead and recklessly dispossessed her antecedents of their identities and origins anyway because the Defendants fundamentally lack respect for people like the Plaintiff and her antecedents; and the Defendants subject people like her and her antecedents, as a group, to human rights abuses, as if it is business as usual, especially when it is in furtherance of the Defendants' monetary objectives.

21. The Plaintiff further asserts that the Defendants view people like her as "less than", and that all subsequent administrations of the Defendants' government and monarchy have failed to do anything to remedy the situation because they side with their predecessors and believe the Plaintiff and her antecedents are sub-people who do not deserve the same rights as "real people" and do not need to know anything about their identities other than what they are told by the Defendants.

22. The Plaintiff asserts that her antecedents and others similarly situated were innocent undefended civilians who had done nothing wrong, yet they were wrongfully and unlawfully exiled to foreign lands and imprisoned on their worksites called "plantations"; enslaved and entrapped on their worksites by their de facto employers

(aka their "owners") who had the statutory and apparent authority of the Defendants; and arbitrarily dispossessed of their ethnic nationalities, names, and origins by said de facto employers who failed to respect their identity and other rights, and who were aided and abetted by the Defendants to continue this grotesque practice for hundreds of years.

23. The Plaintiff asserts that said de facto employers, at all times during this period called "slavery" had the statutory and apparent authority of the Defendants to commit these unlawful acts which, starting at or around the early 16th Century and continuing until 1833 when the Defendants decided to act in conformity with their own laws and "abolish" slavery; but despite this abolition, it is the Plaintiff's understanding, based on information and belief, that the Defendants never held a single person accountable for these atrocities—instead, the Defendants paid huge amounts of cash to the de facto employers to compensate them for their "right" to deprive other human beings of all their human rights even though these human beings had done nothing wrong.

24. The Plaintiff individually and on behalf of all others similarly situated asserts that this imprisonment and arbitrary dispossession of identity without due process was an unlawful interference by the Defendants with the right of her antecedents and others similarly situated to know their identity and origin; and that by extension, the Defendants have knowingly and unlawfully interfered with her right to know her own identity and origin which remain unknown to her and others similarly situated to this day; and the Plaintiff believes the Defendants are still actively conspiring to withhold her rights to this day.

25. The Plaintiff asserts that the Defendants have justified participation in these centuries-long conspiracies and their unlawful interference with her antecedents' right to know

their identities and origin, using racial criteria; and she specifies that it is her belief that this interference is discrimination based on racial identity; and she specifies that this racial discrimination is the proximate cause of her lost identity and origin; and she specifies that the Defendants are duty-bound to remedy her injury, especially because the Defendants' conduct violated existing British law at the time, namely the Magna Carta, which clearly prohibited these practices, writ large, but also because of current laws both national and international to which the Defendants apparently adhere—all of which prohibit racial discrimination.

26. The Plaintiff individually and on behalf of all others similarly situated does not at this time know her ethnic nationality, familial roots, origins and original paternal name because the Defendants not only unlawfully interfered with her antecedents' rights to keep their own identities, but they also *failed to keep accurate records* of the real names, identities, origins, and ethnic nationalities of millions of people like her antecedents who the Defendants wrongfully and unlawfully reduced to slavery, (i.e. to imprisonment on their worksites and working their entire working lives and that of many generations of their children - some of whom were forced bred - without a symbolic dollar of pay), without due process.

27. The Plaintiff asserts that this failure to keep accurate records was particularly negligent on the part of the Defendants and that as a consequence, she and others similarly situated are constantly put in humiliating situations where they are unable to respond in social situations when people demand "where do *really* you come from"? (The Plaintiff notes that this very situation has happened to her personally countless times in her life; but it has even occurred at or around November 30, 2022, in Buckingham Palace itself, the situs of the Defendant Monarchy, when a young woman with

Caribbean heritage was interrogated by a senior staff member of King Charles III about her origin and was unable to answer for the very reason that *no records were kept* of her antecedents' origin.)[2]

28. The Plaintiff individually and on behalf of all others similarly situated asserts that by erasing the identities of her forebears and failing to keep records of where they came from, the Defendants assured that all future generations of their progeny, herself included, would remain ignorant of their identities, and who they truly are, and where they originated, and she believes this assurance on the part of the Defendants is tantamount to a human rights abuse.

29. The Plaintiff, individually and on behalf of all others similarly situated would like to know her roots, ethnic origin and familial lineage to a more exact degree than just knowing she is a "black" woman from "Africa" and a "descendant of slaves" from "Africa," and she asserts the Defendants, continuum governmental institutions, should fund the DNA tests that are required to begin her search because it is their fault that she does not know where she comes from and what her ethnic origins are.

30. The Plaintiff would like this Court to take judicial notice of the fact that the countries of Africa are as distinct as the countries of Europe and Asia so that a Swede is not a Bulgarian and a Frenchman is not a Spaniard, and a German is not an Italian—even though they are all "European"— and a Chinese is not Indian, and a Vietnamese is not Japanese—even though they are all "Asians". The same is true of African countries

---

[2] See, Ngozi Fulani tells of 'horrific abuse' after Buckingham Palace racism incidenthttps://www.theguardian.com/uk-news/2022/dec/05/black-charity-boss-ngozi-fulani-tells-of-horrificabuse-after-susan-hussey-palace-racism-incident

and African people: Nigerians are not Ghanaians, and Liberians are not Mauritanians, and Gambians are not Senegalese. They are all unique and distinguishable from each other, and the people of these countries are distinct with distinct languages, cultures and traditions, and they have a reasonable expectation to know their identities beyond just the continental region they are from just like Europeans and Asians; and the Plaintiff would like to know, to the most precise degree possible, just like the Gambians, Chinese, Swedes, English and Japanese, which country her ancestors originated from so that she can have a better sense of her *true* identity and origin.

31. The Plaintiff individually and on behalf of all others similarly situated asserts that she has an individual, fundamental, and constitutional right to know her individual identity—specifically her ethnic identity and origin—and that the Defendants along with their subjects, agents and representatives have treated her and others similarly situated as a monolith and label – i.e., as "black people" who by definition have no individuality, even though each person who fits that coded definition is an individual.

32. The Plaintiff asserts that the Defendants have unlawfully interfered with her fundamental right to know her identity by relegating her to a monolith and treating this monolith as a single entity that has no individual right to know their own individual identity beyond being identified by the color code "black people," and by a generalized continental region "Africa"–even when individuals actually living on or born on the African continent insist on knowing their own ethnic identities, in addition to knowing they are "Africans."

33. The Plaintiff individually and on behalf of all others similarly situated asserts that

"black people" from the Caribbean, as a monolith, [is] (sic intended) suffering discrimination from the Defendants where this issue of re-establishing their lost individual identities is concerned; that this discrimination is at the root of "structural racism" that the Defendants deny exist; and that judicial intervention is needed in this matter to determine the rights of the petitioners.

34. The Plaintiff individually and on behalf of all others similarly situated asserts that she is subject to different rules and different rights to the rest of society by virtue of her perceived membership in this monolith, and her connection to these millions of undefended civilians who were so egregiously violated in the British Caribbean – specifically with regard to being arbitrarily dispossessed of information about her familial roots and background, ethnic identity and origin—and that this is "structural racism" at its core, that has no place in our society; and that it is cruel to expect her and others like her to just take one for the team on this issue.

35. The Plaintiff asserts that it is time for this system of structured racism to end. However, the Plaintiff asserts that "structural racism" cannot end by osmosis. Rather, specific actions need to be taken by those with authority, such as the Defendants, to break down that structure; and the Plaintiff further asserts that one of the fundamental things that needs to happen is for the Defendants to assist with re-establishing the identities of the millions of people whose identities have been lost when this system of structured racism was erected in the first place.

36. The Plaintiff individually and on behalf of all others similarly situated does not wish to be treated and dismissed as a monolith; she asserts that she has an individual right to

know who she is genealogically – including her background, identity and origin – like anyone else in society, no matter how their antecedents were perceived, no matter their skin color, and no matter the color codes and labels with which she and they are identified.

37. The Plaintiff asserts that lumping the descendants of these millions of undefended civilians together in a monolithic way, in many different contexts, but especially as the catch all "black people" and "descendants of slaves" is detrimental to their individual rights, and exposes them to more discrimination in society, including but not limited to discrimination pertaining to their individual identity rights, and their right to know their origins.

38. The Plaintiff asserts that "Black people" have been monolithically labeled with many false identities. For example, the Plaintiff asserts that designating all people of African ancestry as "black people" and "descendants of slaves" is to impose a false identity on millions of people because it takes away their individuality; that is to say that not all people of African ancestry have "black" skin complexions. Most are various shades of brown and therefore they cannot be objectively described as "black" except to the extent that the Defendants have decided that that is how all people of African ancestry should be described.

39. The Plaintiff asserts that it is also anecdotally true that Europeans all have different skin complexions and colors, and that very few humans have "white" skin color or "white" complexions (assuming, for example, that milk is "white") and that therefore the majority of humans cannot be objectively described as "white" because their skin is a totally different color from milk. Yet ALL members of these two "oppositional"

groups are required to check a color box "black" or "white" on official documents describing themselves with a color that is meant to designate their identities in a monolithically dichotomous, binary, oppositional and false way.

40. The Plaintiff asserts that the color labels were selected to intentionally create an oppositional, binary and dichotomous relationship between people of African descent and people of European descent; and she asserts that these color labels are used to determine degrees of rights. She asserts that these codes are used to determine how people would be treated and which rights they have a right to have, and not have; and she asserts that people's perceived rights follow this oppositional pattern, even down to their right to know their basic identity.

41. The Plaintiff further asserts that none of the undefended civilians who were unlawfully dispossessed of their identities and origins by the Defendants were "slaves" when they were found. They were "free" people who were arrested, kidnapped, trafficked, exiled, imprisoned, forced to work without ever being paid, and dispossessed of their identities and origin without due process of law. Thus, the Plaintiff asserts that identifying her and others similarly situated as "descendants of slaves" is likewise to impose a false identity onto millions of people.

42. The Plaintiff posits that a more accurate identity for her and others similarly situated is "Descendants of unpaid workers," and she believes that individuals should be able to describe their skin colors as it truly is.

43. The Plaintiff further asserts that imposing this identity "descendant of slaves" upon her, and others similarly situated, while withholding their right to know their true origin and identity, is to add insult to their injuries and the injuries of their antecedents,

and to further expose generations after generations of people to "structural racism" in the global society, into perpetuity.

44. The Plaintiff further asserts that this monolithic identity of "black people" and "descendants of slaves" is detrimental to her and others similarly situated because these monolithic labels erase their individual rights – including their individual right to know their true identity; their individual right to accurately trace their lineage in the same manner as the Defendants and their kin are able; their individual right to know their ethnic origins; their individual right to describe themselves with the actual skin complexion that they are, and not be color-coded by authorities with a color that is not their true skin color; and ultimately their individual right to be equal to all other persons in society who can identify their familial origins going back multiple generations, and who, except for people of European origin, are not usually subject to a color code.

### The Defendants

45. The Defendants are two of the most powerful political and imperial entities ever to exist on the face of the Earth in modern times.

46. The Defendants are the Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the Institution known as the British Monarchy ("the Crown") – the latter being a continuum family dynasty that has held a position of political leadership, uninterruptedly in England, for millennia, and the former being a continuum government that has existed for centuries.

47. The Defendant Institution of the British Monarchy aka «the Crown» is, and always has been, central to the political affairs and governance of the British state. The monarch is the Head of State of England and the United Kingdom, in fact. Indeed, the government of England and the United Kingdom was once an absolute Monarchy. Even though the country is today a "democracy" and "constitutional monarchy", the Government of England and the United Kingdom is still commonly referred to as His or Her "Majesty's Government."

48. The Defendant Institution of the British Monarchy aka «the Crown» is a family "dynasty" which can be traced to William the Conqueror; and this family dynasty has ruled the British Empire during the period in question stemming from Queen Elizabeth I in the 1500s to King William IV in 1833 when slavery was officially "abolished" with the stroke of a pen wielded by King William IV who gave the obligatory "royal assent" to once and for all put an end to these unlawful practices, activities, and conspiracies, though not the *effects* of those practices, activities and conspiracies.[3]

49. The Defendant Institution of the British Monarchy aka «the Crown» is distinct from individual monarchs ("representatives" of the monarchy) and is subject to civil suit in the United Kingdom pursuant to the 1947 Crown Proceedings Act.[4]

---

[3] "British trading in enslaved Africans became established in the 1500s. In 1562 Captain John Hawkins was the first known Englishman to include enslaved Africans in his cargo. Queen Elizabeth approved of his journey, during which he captured 300 Africans. He then sailed across the North Atlantic and exchanged them for hides, ginger and sugar. He returned to London in 1563. Thirsty for greater profits, he organised another voyage for 1564 to which Queen Elizabeth contributed one vessel."
https://www.npg.org.uk/learning/digital/history/abolition-of-slavery/the-slavetrade#:~:text=Queen%20Elizabeth%20enjoyed%20the%20profits,consistent%20presence%20in%20Englis
h%20 life.
[4] See https://www.legislation.gov.uk/ukpga/Geo6/10-11/44/section/1

50. The Defendant Institution of the British Monarchy is not or should not be immune from suit as an institutional body; nor can the Institution claim "sovereign immunity" when some of its representatives and agents have acted wrongfully and have harmed people in the manner and magnitude that they have, as a matter of practice and policy, in the name of the Institution, for such a long duration--only to have each successor throw their hands up and say: "it's not our fault."

51. The Defendant Institution of the British Monarchy aka «the Crown» routinely, through its then representatives and agents, namely its monarchs, gave "royal assent" to the British Parliament and Government to enact various legislation legalizing and condoning these unlawful commercial practices that involved erasing the identities of millions of people and causing other grotesque injuries to these people, some of whom are the direct antecedents of the Plaintiff. The Plaintiff asserts that by assenting to the erasure of the identities of her antecedents, the Defendants, beginning in or around the early 16th century and continuing up to the present day, have assented to the erasure of her own identity by default.

52. The Defendant Institution of the British Monarchy aka «the Crown», has now seen multiple monarchs from the same familial line since the early 16th Century. At least thirteen of these actively participated in dispossessing innocent civilians of their origins and identities. They include **Queen Elizabeth 1** (1558 - 1603) **King James I** (1603 – 1625). **King Charles I** (1625 – 1649).  **King Charles II** (1660 – 1685). **King James II** (1685 – 1688). **King William III** (1688 – 1702) and **Queen Mary II** (1688 – 1694). **Queen Anne** (1702 – 1714). **King George I** (1714–27). **King George II**

(1727–60). **King George III** (1760–1820). **King George IV** (1820–30). and **King William IV** (1830–37).

53. King William IV gave his "royal assent" to bring slavery to an end in 1833. However, even though the King was aware that millions of innocent civilians had been unlawfully enslaved with the assent of his predecessors, he failed to provide any remedy for the millions of innocent undefended civilians who were alive in 1833 and who had done nothing wrong to warrant being dispossessed of their identity and origin, but who had been dispossessed anyway. These civilians did not have an attorney. They did not have the financial means to hire an attorney even if one existed that would have been willing to take the case. They did not have the requisite legal knowledge to handle the case themselves as the Plaintiff in this case is attempting to do. These unwitting individuals continued to have children whose identities and origins were false and/or unknown, because they had no recourse, and nobody cared about their rights.

54. Subsequent to the "abolition of slavery" and the death of King William IV, all of his successors in the Institution known as the British Monarchy not only knew that these law-breaking commercial activities involving kidnapping and enslaving innocent civilians had transpired, but they also know that it was the Crown that had given "royal assent" for these unlawful commercial activities to continue unfettered in the commonwealth Caribbean countries, and elsewhere. The Monarchs subsequent include seven sovereigns: **Queen Victoria** (1837–1901). **King Edward VII** (1901–10). **King George V** (1910–36). **King Edward VIII** (1936**). King George VI** (1936–52). **Queen Elizabeth II** (1952–2022). **King Charles III** (2022 – present).

55. In all, there have been at least 19 known representatives of the Institution of the British Monarchy who knew or ought to have known that millions of innocent undefended civilians had been grotesquely harmed, and that their descendants continue to live without knowing their origins and identities to this day; but to date, each and every one of these sovereigns have been uncaring, apathetic and oblivious that the actions of their predecessors, in furtherance of the profit and benefit of the Institution of the Monarchy, whose riches they all enjoy and partake in—and a significant portion of which comes from "slave" labor—have had such adverse effects on the lives of people who are living today without any knowledge of their origins and true identities.

56. The Defendant Institution of the British Monarchy aka «the Crown», and its representatives should care that their predecessors participated directly and indirectly in depriving millions of people of their life, liberty and identity for untold commercial gain and have left their descendants without an identity to this day; the monarchy's representatives, part of a continuum that can be traced back for millennia, can decline to continue to be uncaring and apathetic towards the grievances of the aggrieved. That their predecessors declined to show any accountability does not mean that they too should decline to show accountability.  That their predecessors declined to show any accountability does not mean that accountability is not still owing and outstanding. To this day, it appears to the Plaintiff that the representatives of the Institution of the British Monarchy do not *get* the harm they have caused. They seem to believe that mouthing "I'm sorry" and reading prepared speeches while royal engagements somehow takes care of the problem without them having to take any action whatsoever, except for spewing words, to show their genuine remorse.

57. The representatives of the Government of England and the United Kingdom are likewise remiss. There have been countless prime ministers of the Defendants' government.

58. In all there have been about fifty-six prime ministers although several served multiple terms, which means that there have been considerably more than 56 administrations that have come and gone since these undefended civilians were first dispossessed of their identities and origin. They include **Robert Walpole** (1721–42**). Spencer Compton** (1742–43) **Henry Pelham** (1743–54) **Thomas Pelham-Holles** (1754–56; 1st time). **William Cavendish** (1756–57). **Thomas Pelham-Holles** (1757–62; 2nd time). **John Stuart** (1762–63). **George Grenville** (1763–65). **Charles Watson Wentworth** (1765–66; 1st time). **William Pitt, the Elder** (1766–68). **Augustus Henry Fitzroy** (1768–70). **Frederick North** (1770–82). **Charles Watson Wentworth** (1782; 2nd time). **William Petty-Fitzmaurice** (1782–83). **William Henry Cavendish-Bentinck** (1783; 1st time). **William Pitt, the Younger** (1783–1801; 1st time). **Henry Addington** (1801–04). **William Pitt, the Younger** (1804–06; 2nd time). **William Wyndham Grenville** (1806–07). **William Henry Cavendish-Bentinck** (1807–09; 2nd time). **Spencer Perceval** (1809–12). **Robert Banks Jenkinson** (1812–27). **George Canning** (1827). **Frederick John Robinson** (1827–28). **Arthur Wellesley** (1828–30; 1st time). **Charles Grey** (1830–34). **William Lamb** (1834; 1st time). **Arthur Wellesley** (1834; 2nd time). **Robert Peel** (1834–35; 1st time). **William Lamb** (1835–41; 2nd time). **Robert Peel** (1841–46; 2nd time). **John Russell** (1846–52; 1st time. **Edward Geoffrey Stanley** (1852; 1st time). **George Hamilton-Gordon** (1852–55). **Henry John Temple** (1855–58; 1st time). **Edward Geoffrey Stanley** (1858–59; 2nd time). **Henry John Temple** (1859–65; 2nd time). **John Russell** (1865–66; 2nd

time). **Edward Geoffrey Stanley** (1866–68; 3rd time). **Benjamin Disraeli** (1868; 1st time). **William Ewart Gladstone** (1868–74; 1st time). **Benjamin Disraeli** (1874–80; 2nd time). **William Ewart Gladstone** (1880–85; 2nd time). **Robert Cecil** (1885–86; 1st time). **William Ewart Gladstone** (1886; 3rd time). **Robert Cecil** (1886–92; 2nd time). **William Ewart Gladstone** (1892–94; 4th time). **Archibald Philip Primrose** (1894–95). **Robert Cecil** (1895–1902; 3rd time). **Arthur James Balfour** (1902–05). **Henry Campbell-Bannerman** (1905–08). **H.H. Asquith** (1908–16). **David Lloyd George** (1916–22). **Bonar Law** (1922–23). **Stanley Baldwin** (1923–24; 1st time). **Ramsay Macdonald** (1924; 1st time). **Stanley Baldwin** (1924–29; 2nd time). **Ramsay Macdonald** (1929–35; 2nd time). **Stanley Baldwin** (1935–37; 3rd time). **Neville Chamberlain** (1937–40). **Winston Churchill** (1940–45; 1st time). **Clement Attlee** (1945–51). **Winston Churchill** (1951–55; 2nd time). **Anthony Eden** (1955–57). **Harold Macmillan** (1957–63). **Alec Douglas-Home** (1963–64). **Harold Wilson** (1964–70; 1st time). **Edward Heath** (1970–74). **Harold Wilson** (1974–76; 2nd time). **James Callaghan** (1976–79). **Margaret Thatcher** (1979–90). **John Major** (1990–97). **Tony Blair** (1997–2007). **Gordon Brown** (2007–10). **David Cameron** (2010–16**). Theresa May** (2016–19). **Boris Johnson** (2019–22). **Liz Truss** (2022). **Rishi Sunak** (2022–)[5]

59. Each and every one of these prime ministers were aware of the history and knew or ought to have known that their predecessors had broken laws with these practices, activities and conspiracies that were dubbed "the slave trade" and they also knew/know that innocent undefended civilians had been injured or were being injured or are injured to this day, and they knew/know or ought to have known/know that they

---

[5] This list can be found here https://www.britannica.com/topic/list-of-prime-ministers-of-Great-Britain-andthe-United-Kingdom-1800350

had/have a duty to put a stop to these egregious practices and assist the injured people with re-establishing their lost identities and origins, at a minimum; but to this day not one of them have stepped up. Indeed, each and every one has been either oblivious or defiant.

60. The Defendants' parliamentary bodies that include the Parliament of England and the United Kingdom (pre-1707) and the Parliament of the United Kingdom (post 1707) comprised innumerable ministers and parliamentarians and House Speakers and Lords who had/have legislative power to make laws, amend laws and outlaw unlawful practices, for centuries. Indeed, they had "supremacy." Until "slavery" was finally abolished in 1833 by the parliament with the royal assent, none of these parliamentarians, like prime ministers and monarchs, showed any concern for the law-breaking activities that were resulting in the loss of identity and origin of millions of undefended civilians who had done nothing wrong, and who desperately needed the intervention of the authorities to stop the atrocities being committed against them and their progeny.

61. The Defendants' representatives and agents are responsible for cleaning up after their predecessors; in this case, not only did their predecessors actively aid and abet law-breaking private commercial actors with statutory and apparent authority, but they also sometimes participated more directly in the wrongdoing by forming their own law-breaking enterprises such as the Royal African Company, which was formed in 1660 according to historical records, and managed by the then Duke of York, brother of the then King Charles II (antecedent of the current King Charles III), for years.

62. The Defendant Institution of the British Monarchy aka «the Crown» and the Government of England and the United Kingdom, through their representatives and agents, starting at or around the early 16th Century, participated in these conspiracies to unlawfully deprive individuals of their identities, including their origins, names, family history, ethnicity, tribe, nationality, and lineage – SOLELY FOR COMMERCIAL GAIN - even though the Defendants had the duty and power to stop these conspiracies on day one, pursuant to their own laws which were in force, as well as pursuant to their police powers and discretionary powers which were always at their disposal.

63. The Defendants abused their power by conspiring with private actors to kidnap millions of innocent people who had done nothing wrong; exiling and entrapping these innocent undefended civilians on worksites in distant lands where these undefended civilians were imprisoned (they were not free to leave) and forced to work for their entire lifetimes without even a symbolic $ dollar of pay; and permanently erasing the identities and origins of these individuals so that generations after generations of their progeny have no idea who they are, and where they come from, to this day.

64. The Defendants and their representatives and agents had a duty to intervene to stop these unlawful practices, activities, and conspiracies from day one and they have a continuing duty to restitute those who were harmed in the interim, as they have done in other instances, and will do in others; but they have failed to restitute the injured people *in this case* for discriminatory reasons.

65. The Defendant Institution of the British Monarchy aka «the Crown» has continued to harm the Plaintiff with each new successor to the throne by continuing to refuse to

accept responsibility and show accountability for the injuries caused by the unlawful

interference with the rights of millions of people to know their origins, and identities,

and where they come from.

66. The Defendants jointly and severally are still part of a huge network of co-conspirators

who share a collective responsibility for restituting a great number of people who have

had their identities erased; but the Defendants remain intent on keeping the status quo

in place where millions of people are dispossessed of their *true* identities and origin.

The Defendants and these co-conspirators intend for this deprivation of identity to go

on into perpetuity.

67. The Defendants conspired with private actors to traffic human people for commercial

gain and erase the identities of millions of people for hundreds of years and would like

the Plaintiff and others similarly situated who have no idea what their origins and

identities are as a consequence of the wrongful acts of the Defendants, to believe that it

is justice if they accept the status quo, act like this unlawful interference never even

happened, never speak about it in polite company, "move on," and thank the

Defendants for giving them "civilization."

68. The Defendants are no doubt audacious for committing these breathtaking atrocities

for so long and subjecting so many people to such grotesque injustice and then

thinking that they call all the shots about how the injured people should feel about the

whole sordid mess, and convincing the injured people and the entire world that it is

best that everybody, especially for the injured people, for the injured people to just

"move on," without the Defendants even apologizing in a serious and official way on

the state level, never mind making any amends, whatsoever, or even doing something so miniscule as to help the injured people to re-establish their lost identities.

69. The Defendants know that it is not theirs but it is the prerogative of the injured people to say when and if they are ready to move on; but the Defendants usurp the prerogative of the injured people because the Defendants think that the antecedents of these injured people were "nonpersons," and lowly "slaves" that they rendered "civilized", and the Defendants continue to think of the progeny of these "non persons" and "slaves" as being less entitled to the same human rights as everyone else in society.

70. The Defendants are the same Defendants who have played central roles for other groups of people, such as the Jewish people, in the international community, who were injured by governments, and who were compensated and restituted for their injuries; and the Defendants are now talking about reparations for other groups that have been injured by other governments in ongoing conflicts in Europe but any conversation about restitution to the aggrieved people in this matter has been a nonstarter to the Defendants for centuries.

71. The Defendants are continuum political entities who are accountable to the Plaintiff and others similarly situated for the erasure of their identities as a consequence of the wrongful and unlawful acts of agents, representatives and subjects of the Defendants, but because of their power and the plaintiffs' lack of power and social status in the global community, the Defendants have never been held accountable for their actions, nor have they ever seen fit to step up and do the right thing on their own volition.

72. The Defendants are the principal, and their subjects, agents and representatives—prime ministers, monarchs, judges, and parliamentarians—represent and work for, and on behalf of, the Defendants, and in the name of the Defendants, and the Defendants are therefore responsible for the acts of their subjects, agents and representatives.

73. The Defendant Institution of the British Monarchy aka «the Crown» is a principal that is also a *continuum* whose traditions, responsibilities and rituals, rights and inheritances continue *without interruption* from one monarch to the next; and the Government of England and the United Kingdom is also a principal that is a continuum that goes from one administration to the next, one parliament to the next, one prime minister to the next – without interruption. Accordingly, new administrations or monarchs, who are the new subjects, agents and representatives of this government and monarchy are responsible for cleaning up the mess left by their predecessors, even if they did not create the mess themselves.

74. The Defendants, to be clear, are liable for this unlawful interference with the Plaintiff's right to know her identity and origin even if no principal/agent relationship is found.

75. The Defendants treat the Plaintiff and others similarly situated in a discriminatory way where restitution is concerned, as though they think the Plaintiff is not entitled to protection of the law just because the Plaintiff and others similarly situated are "black people" from "small islands" that have no clout on the international stage; and just because the Defendants are now manned by new representatives and agents who did not commit the initial wrongful acts themselves.

76. The Defendants' acts are the Defendants' acts.  Whether the acts are done directly or vicariously by representatives and agents who are alive or deceased, they are the acts

of the Defendants. See, e.g. The UK Equality Act 2010 109 (2) "Anything done by an agent for a principal, with the authority of the principal, must be treated as also done by the principal."

77. The Defendants jointly and severally are directly liable to the Plaintiff for this interference with her right to know her origin and identity irrespective of how she looks or her small-island-provenance; and the Defendants cannot claim that they are blameless when their representatives and agents are derelict in the execution of their duties, when they violate their own laws which they promulgated themselves on behalf of the Defendants, and when they commit this magnitude of harm to so many people.

78. The Defendants are directly liable, and they are also vicariously liable for the actions of their representatives and agents dead or alive, at all times; and this includes for the actions of their representatives and agents which took place during the period colloquially called "slavery."

79. The Defendants' current representatives are likewise accountable to people who have been injured and aggrieved and have suffered adverse effects as a consequence of unlawful actions by the predecessors of these agents and representatives when these predecessors' unlawful actions were executed in the scope of their work and representation of the Defendants.

80. The Defendants have a relationship to their representatives and agents that is similar to the one that a corporation has to its agents and representatives. Even though a corporation cannot "act" for itself but by necessity must have others act on its behalf, the corporation can be held accountable for these acts, as if the corporation had acted for itself.

81. The Defendants function like corporate entities in a certain sense. That being the case, if a corporation can be held accountable for wrongdoing (even crimes) for actions that are committed by its agents for the benefit of the corporation and that are done in the scope of the agents' employment, then so too should the Institution of the Monarchy and the UK government be held accountable for the wrongful acts of their representatives and agents whose wrongful actions were committed in the scope of their tenure as representatives for the Crown and government, respectively, and whose wrongful actions also benefitted the Crown and government, respectively, both directly and indirectly, and whose wrongful actions continue to cause harmful effects to people living today.

82. The Defendant Institution of the British Monarchy, and England as a state and government, are not exempt from accountability for actively participating in conspiracies with private commercial actors to wrongfully deprive innocent undefended civilians of diverse African ethnicities and nationalities of their *true* identities for commercial gain just because some of their agents and representatives have died, and just because the injured people are described and coded as "black."

83. The Defendants are liable to the Plaintiff and others similarly situated for their loss of identity and for being dispossessed of information about their origins as a consequence of the unlawful enslavement of their antecedents; and the current representatives and agents of the Defendants are accountable to the aggrieved people and need to provide a remedy to the aggrieved people so that the aggrieved people can unpack their identities.

84. The Defendant government and monarchy, to reiterate, are vicariously liable for the actions of ALL their representatives and agents, dead or alive.  The Defendants are also directly liable for wrongful actions done in their names.

85. The Defendant government and monarchy being dependent on their representatives and agents to act on their behalf, are bound by the acts of their representatives and agents who act on their behalf—just like a corporation is bound by its representatives and agents--even when these representatives and agents make a mess. To the extent that the Defendants' representatives and agents continue to act in a discriminatory way towards the aggrieved, insofar as their responsibility to restitute the aggrieved for wrongful and unlawful actions of previous representatives of the Defendant, this also bounds the Defendants. This marks the Defendants as institutions where discrimination and structural racism are sanctioned.

86. The Defendant government and monarchy being dependent on their representatives and agents to act on their behalf, means that the Defendants' current representatives and agents have sanctioned discrimination and structural racism.

87. The Defendant government and monarchy are responsible for cleaning up the messes of their predecessor representatives and agents, including the mess in the case at bar where the Defendants' representatives and agents engaged in unlawful conduct that has led to fundamental and grave injury to millions of people who have lost their identities and information about their origin as a consequence of this unlawful conduct. The current representatives are responsible to clean up this mess, even if it was their predecessors who did the dirty deed.

88. The Defendants' current representatives and agents' responsibility to clean up the messes of their predecessors was apparent when Suella Braverman, the current sitting Home Secretary, faced the Home Affairs Committee on UK immigration policy and was repeatedly asked "whose fault is it?" that the migrant situation was in such a mess. The Committee chair made it clear to Ms. Braverman that blaming her predecessors for breaching the law where these migrants were concerned was not going to fly because, as explained by the committee chair, the UK Home Secretary has knowledge of the problem and it is the secretary's job to rectify the problem, notwithstanding the fact that the problem occurred on the watches of her predecessors.[6]

89. The Defendants jointly and severally gave/have given/give their agents, representatives and subjects the authority to commit unlawful acts of interference through their judicial precedents, traditions, rules, laws, regulations, assents, acts and omissions; and the Defendants' representatives and agents cover themselves by blaming their predecessors when convenient; and the Defendants' representatives and agents are escape their responsibility to clean up the mess left by their predecessors whose unlawful interference with the identity rights of millions of people has led to the Plaintiff's injuries, by saying 'it's not our fault" (a tactic they have employed for centuries) when they know darned well that it is not about which one of them did it, that as representatives of these continuum institutions, it is about doing their job and cleaning up the messes that serve to tarnish the reputation of the institutions they serve. But in this situation, the agents and representatives of the Defendants hide behind their

---

[6] See, Suella Braverman faces Home Affairs Committee on Immigration Policy
https://www.youtube.com/watch?v=QzRmXt8hMqY

predecessors because it allows them to get away with failing to restitute the aggrieved into perpetuity.  This court should not help them to get away with this.

90. The Defendants and their previous representatives and agents were wrong to have authorized, assented to, and participated in conspiracies which included trading, trafficking, kidnapping and imprisoning undefended innocent civilians who had done nothing wrong; they were wrong to have erased the identities of these civilians for commercial gain; they were wrong for not keeping any records of where these people came from, what their origins were, and what their original names were; and they were wrong for not cleaning up the mess and helping the injured people to re-establish their identities. The Defendants' current representatives are wrong to follow their predecessors and be accessories to depriving millions of people of their rightful identities. All of this is the fault of ALL of the Defendants' agents and representatives—starting in the 16th Century and continuing to the current day. Not one is immune from accountability in this situation.

91. The Defendants' failure to keep accurate records or insist that their subjects keep accurate records of the Plaintiff's antecedents is huge because this failure has ensured that every subsequent generation of the civilians' relatives, up to and including the current day, remain ignorant of their true origins and identities—and this will continue into perpetuity—even though not one of these people did anything wrong to deserve this.

92. The Defendants' participation in these conspiracies, which were both international and local in nature and scope, legitimized unlawful practices, activities and conspiracies in

international, transatlantic, transoceanic, and interstate commerce, in violation of existing laws then and now.

93. The Defendants' participation in these conspiracies have had, and is having, an ongoing adverse *effect* on Americans who are of Caribbean heritage and living in the United States, because when people don't know who they are, they have a reduced sense of belonging in their communities, and they are "othered" by their community members to their detriment.

94. The Defendants are aware that when groups of people or "othered" and treated in a disparate and discriminatory way by their government, this can lead to general discrimination against these people in society as well as a culture where "structural racism" flourishes, and this in turn could lead to situations that are not in the best interest of the individuals or the whole society.

95. To be clear, the Defendants' actions are *actionable per se* even if the Plaintiff has suffered no adverse effects because the fact that this unlawful interference occurred in the first place, and all the other atrocities that went with it—including the unlawful lifelong imprisonment on these plantation worksites of innocent undefended civilians who had done nothing wrong—and the subsequent omission to provide any remedy at all to the injured people, shocks the conscience, and cries out for a remedy as a matter of law and equity, without the necessity of a trial.

96. The Defendants and their representatives and agents knew/know their actions to be unlawful and harmful, and that commercially trafficking human beings and arbitrarily imprisoning human beings on their worksites for unpaid labor that lasted the entire lifetime of these individuals (who. had. done. nothing. wrong.) was in direct violation

of existing law at the time, namely the 1215 Magna Carta, which has been in force uninterruptedly in England since 1215, and which clearly prohibited these unlawful, harmful, and predatory commercial practices, writ large.

97. The Defendants and their representatives and agents knew that the Magna Carta clearly prohibited the Government of England and the United Kingdom, as well as its political subdivisions, agencies, instrumentalities, and the British Monarchy, aka the "Crown", from "assenting" to these commercial practices whereby British subjects (aka de facto employers) not only kidnapped and imprisoned millions of undefended civilians who had committed no wrongdoing, but also "dispossessed" them of their identities and origins, and effectively dispossessed generations of these civilians' surviving relatives (whose only crime in this saga was that they were born) of any information about their *true* identities and origin (the unlawful "seizure" of these!) without due process of law.

### Consequences of the loss of identity

98. The Defendants' actions and inactions, and their conspiracy against the rights of the Plaintiff, and their unlawful interference with the Plaintiff's right to know her identity and origin, have caused the Plaintiff and others similarly situated to suffer stigma that stems from these historical injuries.

99. The Defendants' actions and inactions have caused the Plaintiff to suffer an identity crisis.

100. The Defendants' actions and inactions have caused the Plaintiff to not know her true identity and origin, and thus rob her of her dignity –especially when in social situations

when she is asked "where do you really come from?" and is made to feel ashamed and abnormal that she does not know the answer.

101. Not knowing her *true* identity – including original family names, ethnic nationality, national origin and ancestral lineage – is a serious injury that takes away the Plaintiff's individuality, sense of equality, and sense of belonging.

102. Not knowing her *true* identity – including original family names, ethnic nationality, national origin and ancestral lineage – is a serious injury that puts the Plaintiff on unequal footing with others in society who have never suffered this type of indignity.

103. Not knowing her *true* identity – including original family names, ethnic nationality, national origin and ancestral lineage – is a serious injury that exposes the Plaintiff to unequal protection of the laws.

104. Not knowing her *true* identity has created a gap of knowledge about her individuality that has had harmful psychological, emotional, and social impacts on the Plaintiff.

105. Not knowing her *true* identity impacts how others in society who can recite their origins with a significantly greater degree of precision, view the Plaintiff.

106. Not knowing her *true* identity impacts the Plaintiff's sense of possessing full citizenship and likewise impacts the way others in society view the citizenship rights of the Plaintiff.

107. Not knowing her *true* identity victimizes the Plaintiff and others similarly situated and can and has led to bigotry and abuse as noted by Amnesty.org.uk "When the right to an identity is not upheld, bigotry and abuse can flourish. Those who look or sound different may find themselves targets of violent attacks, maybe on the basis of race, sexuality, gender, religion, appearance – or even their taste in music or clothes."[7]

## **The Plaintiff's Injuries are uniform across the board for millions of people**

108. Millions of others similarly situated to the Plaintiff have no idea where they came from and what their true identities and origins are, because of the unlawful conduct of the Defendants.

109. The Deprivation of identity is fundamentally injurious to the Plaintiff, and others similarly situated.

110. The Deprivation of identity while fundamentally injurious is actionable per se and requires no proof that the plaintiffs have been injured.

111. The deprivation of identity is ongoing and continues to injure many millions of individuals in society who, like the Plaintiff, do not know their true identities and origin, and many of whom, like the Plaintiff, do not have the financial means to remedy this injury for themselves.

---

[7] Why we have the right to an identity | Stories & Rights | 23 Oct 2014 | Amnesty International UK

112. The deprivation of identity is proximately caused by the Defendants' actions and inactions, as well as their statutory and apparent authority that were given to people who were routinely breaking existing law by unlawfully interfering with the right of "free" individuals to exist in peace, to be left alone, and to keep their identity and know their origin.

113. The deprivation of identity has gone unaddressed, uncompensated, and un-restituted by these powerful Defendants, who have provided no remedies for these injuries to the Plaintiff and others similarly situated, for hundreds of years.

114. The Defendants jointly and severally knew/know that the putative injured plaintiffs are "readily ascertainable based on objective records," existing in each Commonwealth country (such as birth records, passport records, tax records) but they were never interested in ascertaining who the aggrieved people are because there has never been any question of restituting the aggrieved people.

115. The Defendants know that due to the "uniformity" of injuries, the plaintiffs who are readily ascertainable based on objective records are entitled as a matter of law to certification as a class action to seek justice as a group, if the Defendants refuse to do what is right in this circumstance.

116. The Defendant Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and Monarchy can easily set up a mechanism either in each Commonwealth country, or in a central location, that would fund DNA and genealogical tests for any relative of these millions of undefended civilians that these Defendants harmed between the 16th and 19th

centuries. They can do it logistically and they can afford it financially.  But the Defendants will never do it unless the court orders them to do it.

117. The Defendants' stance is one of "why do you even need to know your origin? Just say you are British" or "Just say you are part of the British Commonwealth"—while at the same time, the Defendants discourage those who are not "Anglo Saxons" from claiming to be British.

**The Defendants have never tried to make the injured people whole**

118. The Defendant Government of England and the United Kingdom, as well as its political subdivisions, agencies, instrumentalities, and Monarchy have never sought to help the Plaintiff and others similarly situated to discover their true identities even though the Defendants clearly have a duty to do so under British, American and International law, and even though the Defendants have the means to do so, and even though the Defendants are sophisticated people who understand that this is something that they should have done ages ago.

119. The Defendants have stubbornly refused to acknowledge their responsibility for the injuries that continue to be endured by the descendants of those millions of undefended civilians, most of whom are indigent, and most of whom are legally unsophisticated and do not know their legal rights.

120. The Defendants and their subjects, agents and representatives know that the majority of the injured people are indigent and would not be able to afford to get these tests even if they wanted to; and the Defendants know that the majority of the injured

people are "legally unsophisticated" people who do not even know they can bring an action to enforce their right to know their identity and origin against the Defendants. All of this adds to the injustice of this unlawful interference by the Defendants and cries out for judicial intervention to determine the rights of the petitioners.

121.  The Defendant Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the Institution of the British Monarchy are duty-bound to restitute the Plaintiff and others similarly situated pursuant to the UN Draft Articles for State Responsibility for Internationally Wrongful Acts (2001) but they seem to think that the Draft Articles only applies to certain types of people and not others.

122.  The Defendant Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the Institution of the British Monarchy, aka «the Crown», as signatories of the UN Convention of the Rights of the Child, are also duty-bound to try to re-establish the identities of the millions of people who have been dispossessed of their identities due to the wrongful actions perpetrated by these powerful Defendants in the international realm against innocent, undefended civilians who had done nothing wrong, but they seem to think that people like the Plaintiff don't count.

123.  The Defendant Government and Institution of the Monarchy of England and the United Kingdom, as signatories of the UN Convention on the Rights of the Child have agreed, pursuant to Article 8 of that Convention, that "where a child is illegally deprived of some or all of the elements of her or his identity, State Parties shall

provide appropriate assistance and protection, with a view to re-establishing speedily her or his identity."

124. The Defendant Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and Institution of the Monarchy of England and the United Kingdom, as signatories of the UN Convention on the Rights of the Child, have agreed, pursuant to Article 8 of that Convention, to "**respect the right of the child to preserve her identity, including nationality, name and family relations as recognized by law without unlawful interference**."

125. The Defendants' behavior towards the Plaintiff and others similarly situated, within the context of these abuses, evinces apathy, tone-deafness  and a callous lack of remorse that helps to encourage "structural racism" to flourish where people like the Plaintiff are seen as not mattering *as much*, or as less entitled to basic rights than others in society.

126. The Defendant Government of England and the United Kingdom, as well as its political subdivisions, agencies, instrumentalities, and Monarchy's failure and refusal to fund DNA tests and help the relatives of these millions of undefended civilians to reestablish their *true* identities, has led to *manifest injustice* to the Plaintiff and others similarly situated.

127. The Defendants should right this *manifest injustice.*

128. The Defendants cannot reasonably deny it is *manifest injustice* to commit wrongful acts of this magnitude and nature, and then refuse to entertain the idea of making

even a modicum of amends, such as an apology, or God forbid funding DNA and

genealogical tests, when they are perfectly able to make these amends, and when the

power differential between the Defendants and the injured people is so great.

129. The Defendants are leaders in the international community who today police other

governments like Vladimir Putin in Russia who likewise commit egregious

wrongdoing against millions of people and the Defendants with their allies attempt to

hold these other governments accountable for "reparations" for wrongful acts

committed by these governments, but the Defendants fail to take responsibility for the

unlawful interference with the Plaintiff's identity rights, and those of others similarly

situated to the Plaintiff. Indeed, the Defendants have failed to express even a

modicum of remorse to the Plaintiff, or others similarly situated, to re-establish their

*true* identities which the Defendants and their subjects, agents and representatives

wrongfully and arbitrarily erased.


130. The Defendants know they have both a legal and ethical duty to provide just

compensation to the Plaintiffs, a part of which must necessarily be to help the injured

people with re-establishing their identities and origin through DNA and genealogical

testing, but Defendants have taken no voluntary action to restitute the injured people

nearly 400 years hence, and it is highly unlikely that they ever will, or that any court

in the UK will order them to do it. This is one of the main reasons that the Plaintiff

has chosen to plead this case before the courts of the State of New York where she

was admitted to practice law and where she hopes that at least she will be given an

opportunity to be heard.

**Defendants are Jointly and Severally Liable for this Unlawful Interference**

131.    The Defendants are jointly and severally liable for this unlawful interference which is tantamount to human rights abuse; and the Defendants jointly and severally had/have a duty to protect these millions of innocent undefended civilians from these arbitrary and unlawful actions of private actors in and from their realm; but the Defendants were negligent and derelict in carrying out their duties: and, indeed, the Defendants were complicit in destroying millions of people's lives, and erasing their identities and origin, and that of many generations of their children, in the most grotesque of ways.

132.    The Defendants jointly and severally knew, or ought to have known, that these commercial practices that included erasing the identities of millions of people were unlawful and wrong and would lead to generational injuries for hundreds of years, to millions of people but they see the people injured as "small" and "insignificant" and "unimportant" and they see themselves as "big" and "powerful" and "beyond reproach."

133.    The Defendants jointly and severally have caused the Plaintiff and others similarly situated who are the living relatives of these millions of undefended civilians, to have false identities, or unnecessarily incomplete identities, and no knowledge of their origins.

134.    The Defendants jointly and severally have injured the Plaintiff and others similarly situated, and the injured people will remain injured until justice is done to help them discover their true identities and origin through DNA and genealogical tests.

**The Plaintiff's Claims are Plausible, and No Defenses are Available to the Defendants**

135. The Defendants cannot deny the veracity and plausibility of everything alleged in this complaint.

136. The Defendants cannot claim a "statute of limitations" defense for their failure to restitute the Plaintiff and others similarly situated, because how does one put a statute of limitations on a person's right to know who they are and where they come from – especially under the unique circumstances of this case?

137. The Defendants cannot claim a "statute of limitations" defense for their failure to restitute the Plaintiff and others similarly situated, because the Defendants have always held all the cards and all the power, and it was the Defendants' unilateral decision to allow these unlawful practices, activities, and conspiracies in the first place; and then outlaw these unlawful practices, activities, and conspiracies when they felt like it; and then to excuse themselves for their own wrongdoing; and then to refuse to even apologize to the injured people never mind assist them with re-establishing their identities; and then to watch gleefully as the clock ran out on the rights of the injured people—for whom the Defendants never recognized any right to have rights in the first place, only to now come before this court asserting that a statute of limitations applies here that frees them from accountability. The Defendants cannot claim a statute of limitations on the rights of the aggrieved without ever acknowledging that the aggrieved people had any rights, or the right to have rights in the first place! This is beyond Machiavélien—even for the Defendants!

138. The Defendants cannot claim a "statute of limitations" defense for their failure to restitute the Plaintiff and others similarly situated, because the adverse effects of the

Defendants' acts, including but not limited to the loss of identity and the emotional

distress that the Plaintiff and others are currently enduring, is a direct consequence of

the Defendants' actions and omission. That is to say that the injuries, namely the

erasure of the Plaintiff's identity and origin never ended but instead have been

continuous and continual for the Plaintiff and all the other injured people, and is

occurring in real time, without limit.

139. The Defendants cannot claim a "statute of limitations" defense for their failure to

restitute the Plaintiff and others similarly situated, because the Defendants are

CONTINUUMS which are still extant even though some of their subjects, agents and

representatives are not; and, these continuums did not erase the plaintiff's identity a

long time ago, such that her injury cannot be traced. It is *now*. Her identity is erased

in the *now*. She is injured *now*. She is alive *now*, and she does not know her origins

*now*. So, the fact that so much time has elapsed is clearly due to the Defendants'

intention to willfully ignore the plaintiffs' injuries into perpetuity and their own

responsibility to rectify the situation.

140. The notion that the Defendants would even think of raising a statute of limitations

defense in this situation is unimaginable and insupportable to the Plaintiff and others

similarly situated considering the plaintiffs are being asked to live with and accept not

knowing who they are and where they come from due to the Defendants' wrongful

acts, even though the plaintiffs have done nothing wrong to deserve this. Moreover,

for the plaintiffs, it is never too late to know who they are and what their origins are,

and in the Plaintiff's view, justice in this case demands that the court gives more

weight to the injured petitioners' right to know their identities, than to the Defendants'

privilege of screaming "Statute of limitation! Statute of limitations!"

141. The Defendants need to understand that this is more than just about paying $300 USD

for DNA tests. This is about finally showing some respect to the human rights of the

plaintiffs and their antecedents.

142. The Defendants furthermore have the means to restitute and compensate the Plaintiff,

and others similarly situated a modest $300 USD each to pay for DNA tests. First, the

Defendants' net-worth far exceeds the plaintiffs' net-worth by a lot, and this is due in

part to the compounded wealth the Defendants have accumulated from centuries of

exploitation of the antecedents of the plaintiffs who worked their entire working lives

from cradle to grave without even a symbolic dollar of pay from the Defendants for

their work. Second, the Defendants' rapid responses to emergencies like Covid 19 and

the UK Energy Bills Support Scheme where they sent out millions of dollars to

individuals in UK, have shown that the Defendants are capable of responding rapidly

and generously to financial emergencies when necessary. Third, the Defendants have

contributed a lot of monies to help to fight Vladimir Putin in the Ukraine. So, if they

wanted to fund DNA testing for the plaintiffs, they easily can—on every level.

143. The Defendant Government of England and the United Kingdom, as well as its

political subdivisions, agencies, and instrumentalities, and the Institution of the British

Monarchy, aka «the Crown», are very close friends and allies of the United States, and

a case of this magnitude will no doubt create foreign relations concerns, however, the

Defendants should be able to appreciate, as should the public at large that in the United

States, "foreign relations concerns that stem from challenging the sovereign acts of foreign states in U.S. courts [must be balanced with the] rights of Americans to vindicate their rights in the judicial system," and hopefully the Executive branch of the government of the United States will not only support the plaintiffs' bid to know their origins but he will speak to his own congress about their shared collective responsibilities in this matter as well.

144. The Defendant Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the Institution of the British Monarchy, aka «the Crown», are subject to the jurisdiction of the American courts pursuant to the Foreign Sovereign Immunities Act ("FSIA") because they are "real parties in interest" and, in fact, these "acts" in question were not "sovereign" at all but rather were "commercial" – and it has been well established that the Defendants do not enjoy "immunity from suits arising from *commercial activities* with a Nexus to the United States."

145. The Defendants are aware that "foreign states (and their agencies and instrumentalities) do not enjoy immunity from suits arising from *commercial activities* with a nexus to the United States" because "Congress viewed the FSIA as 'urgently needed legislation' precisely because 'American citizens are increasingly coming into contact with foreign states and entities owned by foreign states' in commercial contexts."[8]

---

[8] (See, Suing Foreign States in U.S. Courts (justsecurity.org)

146. The Defendants cannot claim that their actions, inactions and omissions alleged in this complaint by the Plaintiff to have led to a loss of her identity and origin and the Defendants' unlawful interference with the Plaintiff's right to know her identity and origin, are "sovereign" acts that warrant "sovereign immunity," because "the underlying activity at issue—the exchange of money for [people's identities, lives, property and freedom]—was commercial in nature and of the type negotiable among private parties."[9]

147. The Defendants cannot claim NOT TO KNOW that their actions, inactions and omissions alleged in this complaint have led to a loss of identity for the Plaintiff and others similarly situated; and that their unlawful interference with the Plaintiff's right to know her identity and origin have led to degradation and humiliation for millions of people like the Plaintiff, even though they suffer in silence because a recent incident in Buckingham Palace highlights the exact humiliation and indignity that people like the Plaintiff endure in social situations when they cannot explain "where do you come from" as most others in society can[10].

148. The Defendants know fully well that their actions, inactions, and omissions were gravely injurious to millions of people and that these actions rose to the level of internationally wrongful acts that violated their own laws such as the Magna Carta and that resulted in the unlawful interference with the rights of these millions of individuals including millions alive today who do not know where they come from.

---

[9] (See, Suing Foreign States in U.S. Courts (justsecurity.org)

[10] Ngozi Fulani: Charity boss in Palace race row faces online abusehttps://www.bbc.com/news/uk-63865890

149. The Defendants know that this case is a one off one, is historically beyond dispute, and is a matter of public record and knowledge; and the Defendants also know that the Plaintiff is entitled to judgment on the pleadings or summary judgment without further need for trial since the veracity and plausibility of the allegations herein cannot be disputed in any way, shape, or form, by the Defendants.

150. The Defendants will no doubt try to avoid accountability and try to put the Plaintiff through a long and painful trial, among other abuses, but the Defendants know that nothing alleged in this complaint can be disputed by the Defendants; and given that the Defendants' actions and interference are clearly wrongful and unlawful pursuant to British law, American and International law, it would be the right thing for the Defendants to agree to remedy this situation as quickly as possible without the spectacle of a trial.

151. The Defendants know that this matter is *res ipsa loquitur,* and that there are no triable issues of fact.

152. The Defendants can do the right, honorable, ethical, moral and legal thing and offer "Substantial *restitutio in integrum*" by funding DNA testing for the injured people and create a trust (or trusts) and appoint a trustee (or trustees) to oversee the disbursement of funds to the people affected without putting the Plaintiff through the further humiliation of a trial; and the Defendants can bring an end to this proceeding at the pleading stage.

153. The Defendants can easily use their immense diplomatic arsenal to see to it that a trust and trustee is placed in each country in the Caribbean where the identities of these

undefended civilians were erased centuries ago, as well as in New York and England,

so that the injured people can easily obtain the necessary funds to pay for DNA and

genealogical tests to re-establish their identities if they desire to do so. Indeed, the

Defendants have a collective responsibility to act with other powerful allies if

necessary to see to it that the plaintiffs' identities and origins are re-established as

speedily as possible.

154. The Defendants know that the FSIA has retroactive application, and the Defendants

should therefore not be surprised that the Plaintiff is respectfully asking this Court to

apply this statute and all other applicable laws retroactively, as necessary, so that

justice is done in this matter, if the Defendants refuse to do that which is right without

the need for lengthy court proceedings.


## THE PARTIES' CONTACT INFORMATION

155. Plaintiff Marion T.D. Lewis, filing individually and on behalf of all others similarly

situated, is an attorney admitted to the Bar of the State of New York whose address is

New York Lawyer Consultation Law Offices of Marion Lewis 40 WALL STREET

Suite 2940 NEW YORK NEW YORK 10005.


156. Defendant Government of England and the United Kingdom, as well as its political

subdivisions, agencies, and instrumentalities, and the Institution of the Monarchy,

pursuant to the Hague Service Convention, have listed their "Central Authority" as:

For the attention of the Foreign Process Section
Senior Master of the Royal Courts of Justice
Room E16
Royal Courts of Justice

Strand
LONDON WC2A 2LL
Email: foreignprocess.rcj@justice.gov.uk

## JURISDICTION AND VENUE

157. This is an action against two Defendants. The first is the Institution of the British Monarchy aka «the Crown», a dynastic continuum that can be historically traced to the Middle Ages. The second defendant is the Government of England and the United Kingdom, otherwise known as "His majesty's government." The Government of England and the United Kingdom is represented by their attorney general who, as of this writing, is Victoria Prentiss, and their solicitor general, who as of this writing is Michael Tomlinson KC MP.

158. Subject matter jurisdiction is proper pursuant to the Foreign Sovereign Immunities Act 28 U.S.C. § 1602 et seq. ("FSIA")

159. Subject matter jurisdiction is proper because the general exceptions to the jurisdictional immunity of a foreign state apply.

160. Pursuant to section 28 U.S.C. §1605A (2) of the statute, this action is based upon "acts outside the territory of the United States in connection with commercial activity of the foreign state elsewhere that causes direct effects in the United States."

161. The direct effects, which are a direct consequence of the Defendants' actions, can be seen in the numerous people of Caribbean heritage currently living in the United States, whose identities have been erased and replaced with false and/or incomplete identities, and who do not know their origin as a consequence of unlawful commercial

activity conducted by the Defendants outside the United States, and who suffer

emotional distress as a consequence of these commercial activities.

162. To be more precise, the "gravamen" of the Plaintiff's complaint is "based upon" the

commercial activities of Defendants. Beginning sometime around the 16th Century

and continuing until 1833 the Defendants, for commercial gain, conspired with private

actors to create a "for profit" scheme they dubbed the "transatlantic slave trade" or

"slavery". This scheme was in direct conflict with existing law at the time, namely the

Magna Carta. In furtherance of their unlawful commercial objectives, the Defendants

and their co-conspirators kidnapped and trafficked the Plaintiff's antecedents and well

as millions of others similarly situated and deprived these undefended civilians who

had done nothing wrong of their identities. The Defendants failed to keep any records

of the origins of these undefended civilians and thus, all information about their origins

were lost. As a consequence of this, the Plaintiff's own identity and information about

her origin has been lost, and she had no idea who she is and where she comes from.

163. Because these practices where wholly "commercial" in nature with a "for profit"

motive and were not part of the Defendants' "police powers," or "sovereign powers,"

or "discretionary powers" – but were instead wholly commercial in nature, namely, to

make money and profit–they are an exception to common law immunity and

sovereign immunity norms, and thus allow this court to exercise jurisdiction over the

Defendants pursuant to the Foreign Sovereign Immunities Act.

164. Even assuming this Court were to find that these practices were "sovereign",

"discretionary", and part of the "police powers" of the State and Monarchy, the

Defendants impliedly waived their immunity when in furtherance of these conspiracies,

they routinely violated their own laws, including but not limited to the 1215 Magna

Carta, which was then in force, and had been in force in England uninterruptedly for

centuries (becoming statute law in 1297), and which to this day is still in force, in

relevant part, eight hundred plus years later, and which likely will continue to be in

force for millennia, as it is now regarded as part of the uncodified Constitution of

England and the United Kingdom.

165. Because the Plaintiff and several generations of her antecedents have suffered

emotional and tortious injuries as a consequence of the Defendants actions – actions

which notably were not required by law as there was no law authorizing these actions-

the "Non-Commercial Torts" exception to the FSIA also applies, thus permitting this

court to exercise jurisdiction over this case on that basis as well.

166. This Court is furthermore permitted to exercise jurisdiction over the Defendants

because the Defendant Government of England and the United Kingdom, as well as

its political subdivisions, agencies, and instrumentalities, is a foreign State whose own

laws unambiguously mirror, inform and indeed form almost the entire basis of the

legal system of the United States. Further, because the remedies sought in this case is

a matter of customary international law, this court's exercise of jurisdiction, and

enforcement of any eventual judgment, would in no way infringe on the sovereign

rights of the Defendants. Neither extraterritoriality nor common law immunity bar this

Court from exercising jurisdiction over the Defendants.

167. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A)

– diversity of citizenship clause. Pursuant to the Class Action Fairness Act (2005), the

dispute and amount in controversy in this case exceeds $5,000,000 exclusive of interest and costs. In addition, at least one member of the class of plaintiffs is a citizen of a State which is different from both Defendants. Moreover, more than two-thirds of the members of the class reside in states or countries which are different from the state in which Defendant is a citizen and in which this case is filed.

168. This Court, additionally, has personal jurisdiction over the Defendants who have a strong nexus to the United States generally, as well as ample and sufficient "purposeful, systematic, and continuous minimum contacts" with the various states of the United States, including New York, and has sufficiently availed themselves of this forum to render the exercise of personal jurisdiction by this Court permissible.

169. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the facts giving rise to Plaintiffs' cause of action occurred in this judicial district and it is the situs of her office in New York.


## HISTORICAL BACKGROUND


170. Sometime beginning around the early 16th Century and continuing until 1833 the Defendants, both the Government and Monarchy of the then British Empire, now United Kingdom, participated in various conspiracies with private commercial actors, for commercial gain, to kidnap, traffic (to foreign lands), sell (as a commodities) and *imprison* (on worksites) millions of undefended civilian people from the African continent who had done nothing wrong, on plantation worksites, in a scheme they called the "Transatlantic Slave Trade," and/or "Slavery".

171.    These undefended African civilians were "exiled" to different lands including what
        are now known as the "British Commonwealth in the Caribbean," or "British
        Commonwealth countries in the Caribbean," where the Plaintiff in this matter was born.

172.    In these foreign lands, these African civilians were "imprisoned" on their worksites in
        the manner of prisoners who had committed wrongdoing even though these
        individuals had committed no wrongdoing —and forced to work their entire lifetime
        without even a symbolic dollar of pay, for multiple generations. According to
        historical records, these African civilians were also force-bred to produce children to
        keep this scheme going for hundreds of years.

173.    These African civilians were "imprisoned" on their worksites, in that they were NOT
        free to leave. Indeed, many suffered violence or death if they tried to leave. As a
        consequence of being forced to remain on their worksites and being "falsely
        imprisoned" by their de facto employers at their place of work for their entire lifetime,
        the Plaintiff's antecedents lost all control over their lives, including records and
        information of their identity and origin. The "effect" of this false imprisonment is that
        the Plaintiff and others similarly situated who are their living descendants do not know
        their true identities, including their ethnic nationalities and origins.

174.    Given that false imprisonment is *actionable per se* pursuant to British law, the
        Plaintiff contends that her action for relief in this case which has resulted in part
        because of the false imprisonment of her antecedents, is likewise *actionable per se*
        pursuant to British law and that no further proof of how she has been injured by the
        Defendants is needed. That is to say that she asserts that the fact that this happened at
        all, entitles her and all others similarly situated to relief as a matter of law.

175.    As if it were not enough to "imprison" the Plaintiff's antecedents who were undefended civilians from Africa, force them to work an entire lifetime without even a symbolic $ dollar of pay—even though none of these people appear to have done anything wrong to warrant lifetime incarceration—these undefended African civilians, some of whom were the antecedents of the Plaintiff, were also arbitrarily "dispossessed" of their names, language, humanity, identity, and information about their origin.

176.    In dispossessing these African civilians of their names, language, humanity, and identity, the British subjects (aka de facto employers) were able to completely control and subdue these individuals for hundreds of years, with the sanction of the government and monarchy of the British state.

177.    It is a matter of historical record and cannot be disputed that these millions of civilians' identities, including their family name as well as their place of birth and country of origin, were erased and that false and/or incomplete identities were imposed on these individuals by the Defendants or because of the Defendants' failure to intervene.

178.    It is also a matter of historical record and is anecdotally apparent that these false identities and/or incomplete identities supplanted the real identities of these undefended civilians, and that these individuals unwittingly passed these false identities and/or incomplete identities to each new generation of their children—continuing up to the current day.

179.    It is also a matter of historical record and anecdotally apparent that these false or incomplete identities have followed the progeny of these undefended civilians and have come to completely replace the *true* identities of millions of people alive today who have no idea what their familial roots are, or where their ethnic nationalities originated, and what their true identities are.

180.    During this period where the initial erasure of identity and origin occurred, the then British Empire now British State was a Kingdom of laws, and in that Kingdom of Laws, the 1215 Magna Carta, a law that has remained uninterruptedly in force in Britain for over 800 years and one that has influenced the laws of many modern democracies, was in force.

181.    The 1215 Magna Carta which remains in force, in relevant part, in England, has become part of the uncodified Constitution of England and the United Kingdom today.

182.    The 1215 Magna Carta clearly prohibited these unlawful and predatory practices whereby British subjects (aka de facto employers) were going into foreign lands and trafficking human beings for commercial gain in the manner that they were, and erasing their identities in this arbitrary manner, and interfering with the rights of these people, without due process.

183.    The 1215 Magna Carta, at article 39, states: "No free man is to be arrested, or imprisoned, or disseised, or outlawed, or exiled, or in any other way ruined, nor will we go against him or send against him, except by the lawful judgment of her peers or by the law of the land."

184.    The Defendants jointly and severally were/are all aware of the prohibitions articulated
        in the 1215 Magna Carta, yet they turned a blind eye when undefended civilians who
        were unsophisticated and unarmed were attacked; and they did this solely for profit
        and commercial gain. These civilians were attacked, trafficked, exiled, outlawed,
        disposed, imprisoned and deprived of life, liberty and property – including the
        property of their identity – for centuries, without due process, even though they had
        done nothing wrong.

185.    The Defendants had a duty to enforce their own laws and prevent their subjects from
        interfering with, trafficking, selling, exiling, arbitrarily dispossessing, and imprisoning
        undefended individuals who had not received due process, and who had done nothing
        wrong.

186.    The Defendants jointly and severally were/are all aware that these undefended
        civilians' identities and other identifying information about their origins were being
        erased because sometimes the Defendants stamped these individuals like cows
        themselves—to wit, the Royal African Company (RAC) which, as a matter of
        historical records, were known to stamp these people as if they were cows being taken
        to the milking house or slaughterhouse.

187.    The Defendants jointly and severally were/are all aware that these undefended
        civilians in/from Africa were "free men" and "free women" when they were arbitrarily
        "arrested" and "imprisoned" on work plantations by British subjects (aka de facto
        employers), and when their identities were interfered with and erased.

188.    The Defendants jointly and severally were/are all aware that these undefended African
        civilians were also "disseised, outlawed, exiled and ruined" without the courtesy of

"lawful judgment" in violation of the 1215 Magna Carta.

189.    These unlawful and predatory practices lasted more than 200 years because it took that amount of time for the Defendant Government of England and the United Kingdom, née the British Empire as well as its political subdivisions, agencies, and instrumentalities, and the Institution of the British Monarchy, aka «the Crown», that gave assent to these atrocities, to respect and obey their own laws, expressly prohibit slavery, and thereby stop their subjects from rampantly committing these interferences and atrocities in their name.

190.    Curiously, the Defendant British Government never officially legalized slavery with an official statute or parliamentary decree; however, by waiting more than 200 years to officially declare slavery illegal, the Defendant British Government authorized and legalized slavery by default.

191.    The British parliament issued various parliamentary acts that gave private actors statutory authority and sometimes apparent authority to engage in these illegal and predatory practices, thus legalizing slavery by default.

192.    An example of a parliamentary act that gave statutory and/or apparent authority to British subjects (aka de facto employers) who were engaged in the practice of enslaving people from the African continent, is the bill to incorporate the Royal African Company (RAC).

193.    The Royal African Company was formed by an act of Parliament according to the

website parliament.uk which indicates that the bill for the formation of this enterprise

was first read in the House of Lords (the British Parliament) in 1671.

194.    The Royal African Company was a monopoly run by the Institution of the British

Monarchy aka «the Crown» through several of its family members for years, before it

was opened to the public, according to historical records. The Royal African Company

"was an English mercantile (trading) company set up in 1660 by the royal Stuart

family and  City of London merchants to trade along the west coast of Africa."

195.    Many other acts of the British parliament gave statutory and apparent authority to

British subjects (aka de facto employers) to continue to enslave innocent undefended

civilians from the African continent and erase their identities as a matter of routine.

These acts, pursuant to the UK Parliaments own website, include that time in in 1788

when then Prime Minister William Pitt stated his intention in the Commons to "raise

the issue of the slave trade." And when Sir William Dolben introduced his "Bill to

regulate the trade." These actions gave credence to the unlawful practices, activities

and conspiracies and made it seem like it was a legitimate form of trade. So, it should

not have come as any surprise to those in authority that British subjects thought they

had their permission to continue these atrocities.

196.    The judiciary branch of the British Empire and the British state also helped to give

statutory and apparent authority to British subjects (aka de facto employers) who

frequently brought cases before the courts to enforce "rights" they believed they had

to enslave innocent civilians and deprive them of their identities. One of the most

famous is the 1771 Sommerset Case which was heard by Lord Mansfield in

Westminster Hall. The esteemed judge never did at any point admonish the plaintiff in the case for his violation of the Magna Carta.

197.   Lord Mansfield had a duty to point out to the Plaintiff in the Sommerset Case that in England, the Magna Carta is in force and as a consequence that the plaintiff in Sommerset had no legal right to "seize, imprison, *dispossess*, outlaw, exile or ruin in any way, nor in any way proceeded against, the defendant in the case, except by the lawful judgement of her peers and the law of the land." In other words, Lord Mansfield should have said very clearly that slavery was illegal and against the law of England and the United Kingdom, and that by "enslaving" the defendant (i.e., imprisoning the defendant on his worksite and forcing the defendant to work his entire life without even a symbolic $ dollar of pay even though the defendant had done nothing wrong) and depriving the defendant of his freedom and identity, that the plaintiff was breaking English law. This would have set a precedent that could have helped end this grotesque practice a lot sooner than 1833. Instead, great Judge let the "slave" go free by saying that the "slave" could not be forced to return to America while on English soil.

198.   The Defendant Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, comprise a parliament, prime minister, court system and a monarchy, each of which, for the entire duration of the scheme known as "slavery" was subject to British law as codified in the 1215 Magna Carta - statute law in England since the year of our Lord 1297.

199.   The Defendants' actions, namely, the giving of statutory and apparent authority to private actors to "seize, imprison, dispossess, outlaw, exile and ruin" millions of

undefended civilians who had done nothing wrong and who had not received "the

lawful judgment of her peers," clearly violated the 1215 Magna Carta which was in

force then, and which continues, in relevant part, to be in force in England to this day.

200.    The Defendants have clearly "denied" and "delayed" right and justice for these

innocent undefended civilians, and they continue to deny and delay right and justice to

the descendants of these undefended civilians who, as a consequence of the

Defendants' unlawful interference with the rights of their antecedents, and the

Defendant's violation of the Magna Carta's prohibitions against arbitrary

imprisonment, dispossession, and seizure of their antecedents, do not know their

identities and origin to this day.

201.    The apparent reason that the Government of England and the United Kingdom née

British Empire, as well as its political subdivisions, agencies, and instrumentalities, and

Institution of the British Monarchy aka «the Crown», had for participating in and

authorizing these unlawful practices, activities, and conspiracies, for so long, is a

question of economics. These African civilians could provide unpaid labor to these

British subjects (aka de facto employers) who needed massive labor forces to work on

plantations where they grew various crops that included cotton, cane, and tobacco

which were needed to grow the British economy and help to enrich the British

Monarchy which today owns various trusts and duchies—such as the Duchy of

Cornwall—that are rumored to be worth billions of dollars. The rub is that these de

facto employers did not want to pay their labor force and they got the Defendants to

give them the authority to "enslave" innocent undefended African civilians and erase

their identities so that they would be unable to fight back against this.

202.  While the Defendant British Empire and British State never officially legalized "slavery" (which everyone knows is nothing but a label used to justify not paying workers—in this instance millions and millions of workers—for their work) with an official statute or parliamentary decree, it is clear that through its parliament, prime minister, monarchs and courts that British subjects (aka de facto employers) believed they had the statutory and apparent authority to enslave millions of people and deprive them and generations of their progeny of their lives, freedom and identities, for commercial gain.

203.  Notably, the sitting British monarchs routinely gave "royal assent" to parliamentary and governmental proposals concerning these practices of enslaving innocent undefended civilians and erasing their identities. These proposals would then become the law of the land. Without this crucial "royal assent" from these monarchs (there were about 12 monarchs who signed off on these dubious proposals), none of these proposals would have ever become the law of the British state.

204.  Indeed, to this day, because of the continuum nature of England and the United Kingdom government and the Institution of the British Monarchy, aka «the Crown», all parliamentary and governmental acts must receive "royal assent" before it is law in England.

205.  The Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, with "royal assent" from the British Monarchy, officially outlawed the practice of enslaving people in 1833 with the Slavery Abolition Act.

206.    The adverse effects of these royal assents are still being felt by the descendants of

these people who still do not know their identities, where they come from, and who

they really are. Indeed, these assents have contributed to the "structural racism" that

exist today where people's rights are determined by their race and color, and where

people like the Plaintiff are expected to be content with subjugation to lesser rights

than others.

207.    The Defendant Government of England and the United Kingdom, as well as its

political subdivisions, agencies, and instrumentalities, and Monarchy knew or ought to

have known that their actions would have had longstanding adverse *effects* on millions

of people, continuing after they "abolished" slavery.  (See, *Smith New Court

Securities v. Scrimgeour Vickers* (UK House of Lords 1996) on the issue of "effects"

that continue after the initial harm caused.) The Defendants know that it was

reasonably foreseeable that millions of people would suffer an adverse effect when the

Defendants erased the identities of their antecedents; and it was likewise reasonably

foreseeable that the Plaintiff and others similarly situated would not be able to

determine their identity without DNA testing. *Smith New Court Securities v.

Scrimgeour Vickers* (UK House of Lords 1996) on the issue of "effects" that continue

after the initial harm caused.

208.    The Defendants cared nothing about the aggrieved and the effects their actions have

had on the aggrieved. Rather, to appease the commercial actors who were angry about

the Abolition Act, the Government of England and the United Kingdom, as well as its

political subdivisions, agencies, and instrumentalities, paid huge sums in settlement to

those who had engaged in the practice of enslaving millions of undefended civilians—

some of whom were the antecedents of the Plaintiff—and erasing their identities and

origins, and by association dispossessing the aggrieved of her own identity and origin.

209.    The Government of England and the United Kingdom, as well as its political

subdivisions, agencies, and instrumentalities, has yet to pay a dime of compensation to

the victims of these unlawful practices, activities, and conspiracies, or to their progeny

who to this day do not know where they came from, and whose identities and

information about their origin have been arbitrarily erased.

210.    The Defendants know their obligation pursuant to established laws both national and

international; and the very least these Defendants can do is assist with the financial

costs of re-establishing the origins and identities of the people they have injured.


## DECLARATORY AND INJUNCTIVE RELIEF


211. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, authorizes this Court to

declare the rights and other legal relations of the parties to this dispute.


212. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff seeks

a declaration from this Court that the actions of the Defendants have amounted to an

unlawful interference with the Plaintiff's right to know her identity and origin.


213. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff seeks

a declaration that all persons are entitled to know their identity, ethnic nationality and

family name, and family roots and that no government has the right to arbitrarily erase a person's identity.

214. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff seeks a declaration from this Court that if a State has aided and abetted private citizens to dispossess persons of their identity and origin, and erase said identity and origin, said State is obliged to aid such deprived persons with re-establishing their identities, as speedily as possible.

215. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff seeks a declaration that by signing the UN Convention on the Rights of the Child, the Defendants agreed to "respect the right of [the Plaintiff in this action] to preserve her identity, including nationality, name, and origin as recognized by law without unlawful interference," as articulated in Article 8 of that Convention.

216. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff seeks a declaration that the Government of England and the United Kingdom, as well as its political subdivisions, agencies, instrumentalities, and the Institution of the British Monarchy, have impliedly agreed, as articulated in Article 8 of the UN Convention on the Rights of the Child, that "where [the Plaintiff in this action] is illegally deprived of some or all of the elements of her identity, [the Defendants in this action] shall provide appropriate assistance and protection, with a view to speedily reestablishing [the Plaintiff's] identity."

217. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks a declaration that the Government of England and the United Kingdom, as well as its political subdivisions, agencies, instrumentalities, and the Institution of

the British Monarchy, have been derelict in their duty to assist the injured persons—the Plaintiff in this action and others similarly situated—with re-establishing their identities, as the Defendants are duty-bound to do pursuant to various international conventions, including but not limited to the UN Draft Articles for State Responsibility for Internationally Wrongful Acts.

218. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks a declaration that the Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities have materially breached their obligations under this convention by committing the wrongful acts in the first place, and then by failing to fulfill their obligation to remedy those wrongful acts in the second place –even while knowing that the consequences of their unlawful actions continue to reverberate with lingering adverse effects for millions of people. (See Article 2 of the Draft Articles).

219. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks a declaration that the Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the Institution of the British Monarchy, must, without further delay, take decisive action to restitute the injured persons and assist them with re-establishing their identities, pursuant to their obligations under the UN Draft Articles for State Responsibility for Internationally Wrongful Acts.

220. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks a declaratory ruling that the Government of England and the United

Kingdom, as well as its political subdivisions, agencies, instrumentalities, must within 60 days of a declaratory ruling in favor of the plaintiffs (it is estimated that there are at least ten million plaintiffs who have been injured in this way), or a reasonable time not long after, deposit into escrow $3,000,000,000 USD to pay for DNA tests for the individuals harmed, including those right here in New York but especially in the British Caribbean, where the majority of the people who have been injured reside.

221. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks a declaratory ruling that the Government of England and the United Kingdom, as well as its political subdivisions, agencies, instrumentalities, that the Defendants must appoint a court-approved trustee or trustees in New York, and in the various countries in the Caribbean to oversee the disbursement of funds such that each individual member of the class can receive a minimum of $300 USD to pay for DNA Tests.

222. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks a declaration that the Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the Institution of the British Monarchy, are duty-bound to assist these injured people with paying for DNA tests, and the Plaintiff asks this Court to advise the Defendants that failure to deposit these funds, a minimum of $3 billion American dollars, will lead to enforcement action against any known property that the Defendants own in the United States.

223. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks an injunction enjoining the court approved trustee or trustees to speedily

disburse all funds to individuals who are members of this class action, within 180 days of their appointment and approval by the Court.

224. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks a declaratory ruling that the vast majority of individuals who are entitled to these DNA testing stipends are in the British Caribbean including but not necessarily limited to the following countries: Anguilla, Cayman Islands, Turks and Caicos Islands, Montserrat, the British Virgin Islands, Antigua and Barbuda, the Bahamas, Barbados, Dominica, Grenada, Jamaica, Saint Kitts, Nevis, Saint Lucia, Saint Vincent and the Grenadines, Guyana, Trinidad and Tobago, Belize and Bermuda. As of 2023 the approximate population of the British Caribbean is as follows:

| | |
|---|---|
| ANGULLA | 15,003 |
| CAYMAN ISLANDS | 65,722 |
| TURKS AND CAICOS ISLANDS | 38,717 |
| MONTSERRAT | 4,992 |
| BRITISH VIRGIN ISLANDS | 30,231 |
| ANTIGUA AND BARBUDA | 97 ,929 |
| BAHAMAS | 393,244 |
| BARBADOS | 287,375 |
| DOMINICA | 71,986 |
| GRENADA | 112,523 |
| JAMAICA | 2,961,167 |
| SAINT KITTS AND NEVIS | 53,199 |

| | |
|---|---|
| BERMUDA | 70,000 |
| SAINT LUCIA | 183,627 |
| SAINT VINCENT AND THE GRENADINES | 110,940 |
| GUYANA | 795,338 |
| TRINIDAD AND TOBAGO | 1,399,488 |
| BELIZE | 412,387 |
| **APPROXIMATE TOTAL POPULATION** | **7,103,8687** |
| | |
| | |
| | |

225. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks an injunction enjoining the Government of England and the United Kingdom, as well as its political subdivisions, agencies, instrumentalities, and the British Monarchy to use its diplomatic channels including its foreign affairs offices and ambassadorships to provide notice to putative class members in each of the countries detailed above, and any other country in the Caribbean not listed, where they are aware that African civilians were enslaved pursuant to their unlawful practices, activities and conspiracies during the period known as "slavery."

226. Pursuant to a declaration of the parties' respective rights and duties, the Plaintiff further seeks an injunction enjoining the Government of England and the United

Kingdom, as well as its political subdivisions, agencies, instrumentalities, and the British Monarchy from using any funds expended in this action whose scope is narrow and limited to the Plaintiff's identity rights and the Defendants unlawful interference with such, as an excuse for not paying further reparations for the unlawful and improper "enslavement" of these millions of undefended civilians, if such cases are brought in the future – either by individuals or states.

227. This Court should take judicial notice that the Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the British Monarchy have had hundreds of years to rectify this situation without necessitating the intervention of this Court but they have categorically refused to make amends to the surviving relatives of these undefended civilians who were harmed so egregiously by the acts and omission of the Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, and the Institution of the British Monarchy, aka «the Crown». Indeed, it is a matter of historical record that there has not been so much as an official, sincere apology by the Government of England and the United Kingdom, as well as its political subdivisions, agencies, and instrumentalities, for the harms it has caused the Plaintiff, her antecedents, and millions of others similarly situated.

228. The Plaintiff informed the Defendants' representatives by email of her intent to sue on two separate occasions if they did not remedy her injury and they have failed to so remedy, or to respond to her communications.

229. The Plaintiff is convinced that it would be impossible to obtain a fair and impartial trial on this issue in England given the past conduct and utterances of representatives

of this government in the past and given the current polarization in British society

concerning issues pertaining to race – including a recent incident that took place in

Buckingham Palace in late 2022 and the "horrific abuse" the victim in that case

endured.

230. An actual controversy has arisen and now exists between the Plaintiff and the

Government of England and the United Kingdom, as well as its political subdivisions,

agencies, and instrumentalities, and the Institution of the British Monarchy, aka «the

Crown», (as distinct from the current sitting monarch or any individual monarch)

concerning the respective rights and duties of the parties.

WHEREFORE, the Plaintiff makes the following claims for relief:

## **FIRST CLAIM FOR RELIEF**
## Discrimination based on origin

231. The Plaintiff re-asserts and incorporates by reference each allegation in paragraphs 1

through 231, inclusive, as if fully set forth herein.

232. The Plaintiff asserts that in violation of the 14th Amendment of the United States

Constitution as well as other constitutional provisions, laws, legislations and treaties,

the Defendants have discriminated against her, and others similarly situated, based on

their ethnic origins, first by participating in conspiracies against the rights of her

antecedents and others similarly situated, violating the human rights of her antecedents

and others similarly situated, and erasing their identities and information about their

origins; then subsequently by refusing to make restitution for the loss of identity and

information about the origins of millions of people alive today who, while they may

have a "nationality," do not know their "national origins" or their "ethnic origins" as a

direct consequence of the Defendants' unlawful commercial conduct.

233. The Plaintiff asserts that the Defendants have disrespected her right to know her origin

and true identity--and the same is true for others similarly situated; that the Defendants

have also been derelict in their duty to assist her and others similarly situated with re-

establishing their origins; and that the Defendants have treated her and others

unfavorably because of their perceived membership in a disfavored group, namely

"Descendant of black slaves" who originated in various countries in Africa; and the

Defendants have refused to make restitution for their unlawful commercial conduct that

led to grave torts against millions; and that the Defendants have discriminated against

her, and have left her and others similarly situated exposed to unequal protection of the

laws in violation of the Constitution of the United States, as well as various

international laws, legislations and conventions.

234. The Plaintiff asserts that the Defendants have refused to honor their obligation to

make restitution for their internationally wrongful acts—acts which include

dispossessing her and others similarly situated of their origin and identity—because of

the plaintiffs' perceived origin from countries in Africa.

235. The Plaintiff asserts that were her antecedents perceived to be Europeans, the

Defendants would have convened a treaty a long time ago in an illustrious European

capital to determine the restitution and compensation packages that would have been

paid to countries and individuals; and the Plaintiff further asserts that the Defendants

would have made a point of helping to re-establish the identities of the people whose identities were lost as a result of unlawful governmental actions that left them without information about their identities and origins.

236. The Plaintiff asserts that the Defendants' consciences would never have allowed them to ignore the arbitrary divestiture of identity and origin of so many innocent, undefended people who had done nothing wrong, if these injured people were Europeans; but the Defendants have had no qualms with ignoring the injuries of millions of people because the injured people are perceived as "insignificant" people of "African" origin, born in small islands in the British Commonwealth in the Caribbean which the Defendants believe they "own," and towards whom the Defendants have acted unconscientiously for centuries.

237. The Plaintiff asserts that because the Defendants will never act on their own accord to rectify this outstanding and egregious injustice and help the plaintiffs to pay for DNA testing to unpack their identities and origins, and that for that reason judicial intervention is needed to determine the rights of the aggrieved.

238. By reason of the foregoing, the Plaintiff individually and on behalf of others similarly situated, has been damaged in an amount of $3,000,000,000.00 USD.

**SECOND CLAIM FOR RELIEF**

Racial Discrimination

239.   The Plaintiff re-asserts and incorporates by reference each allegation in paragraphs 1 through 239, inclusive, as if fully set forth herein.

240.    The Plaintiff asserts that racial discrimination violates the US Constitution, as well as British Human Rights Laws and many international conventions that the United States and England have signed, both vowing to avoid discriminatory conduct in the UK, US, and in the international community at large.

241.    The Plaintiff asserts that making restitution for erasing the identity and information about the origin of the Plaintiff and others similarly situated is the legal and ethical obligation of the Defendants and that they so far have not made restitution because the Plaintiff and others similarly situated are "black" people who have historically been viewed as deserving less protection of the law as compared to their perceived binary opposite "white" people.

242.    The Plaintiff asserts that it is her belief that the Defendants deliberately created a social system based on color codes and labels with which people of African origin and European origin have been classified as "opposites", for centuries, and officially identified by a two opposing colors. These colors do not accurately describe the skin color and complexion of at least 90 percent of the people coded with these colors; however, this color-coding is a key aspect of a race-based structure in society—or "structural racism"—that values a human being, including their perceived rights, according to the color, not of their actual skin, but the color with which they are coded.

243.    The Plaintiff asserts that the reason the Defendants have refused to assist the Plaintiff and others similarly situated with re-establishing their origins and their ethnic identities, is because the Defendants do not fundamentally respect the rights of people coded as "black" in the same way that they respect the rights of people coded as "white" because this is the way the structure they have intentionally built up works; such that people coded as "white" fundamentally have a right to know their identities and origin, and they do know their identities and origin; but people coded as "black" whose ancestors were enslaved, ought

fundamentally to be content that they are at least no longer enslaved, even if they don't know their origins or where they came from.

244.    The Plaintiff asserts that it is her belief that the Defendants justify treating the Plaintiff and others similarly situated as one massive mass and blob, and entitled to the same treatment–for example, "you came from Africa, that's enough for you to know"—because of the color codes a person who is coded "black" is not entitled to anything more.

245.    The Plaintiff asserts that it is unreasonable for the Defendants to believe that "you came from Africa" is enough for the aggrieved people in this situation. The Plaintiff and others similarly situated want to know and deserve to know where they came from with more specificity and particularity. They want to know their *origin.* They want to know and deserve to know their individual *identities.* They want their equality to the rest of the global society.

246.    The Plaintiff asserts that the Defendants ought to acknowledge that they are treating the Plaintiff and others similarly situated in a discriminatory way based on race in violation of the UK Human Rights Act of 1998 which requires public entities, such as the government, to treat everyone "equally with fairness, dignity and respect."

247.    The Plaintiff asserts that failing to make restitution in this situation is fundamentally unfair, undignified, and disrespectful to the Plaintiff and others similarly situated; and that this failure is discrimination against the Plaintiff and others similarly situated, and that this discrimination is based on the color with which the aggrieved have been monolithically coded and labeled for centuries; and that this discrimination needs to stop, and this failure needs to be rectified.

248.    The Defendants, through their unlawful commercial practices and conspiracies, have arbitrarily interfered with the Plaintiff's right to know her origin and identity; but despite the

Defendants' obligation to rectify this situation, pursuant to their own national laws as well as American law and several international conventions that they have signed, they have, to date, done nothing at all to rectify the situation.

249.    The Defendants have no good excuse, especially not the coded color of the aggrieved, for their failure to make restitution.

250.    The Defendants know that failing to make restitution in this circumstance, after all this time, is unconscionable and wrong.

251.    The Defendants know that failing to make restitution in this circumstance, after all this time, is unethical and inexcusable

252.    The Defendants know that failing to make restitution in this circumstance, after all this time, is illegal and indefensible

253.    The Defendants know that failing to make restitution in this circumstance is racial discrimination at its lowest; and that this failure is proof that "structural racism" in fact does exist even though the Defendants vow that "there is no place for racism in our society."

254.    The Defendants know that ending racism in our society begins with them and that it will not happen by them simply saying that "racism does not exist" or that "there is no place in our society for racism." Yet, the Defendants continue to encourage this social disease to infiltrate each new generation by failing to take the necessary action, including but not limited to helping the plaintiffs to re-establish their identities and origin which were lost when the foundations of this racist structure were laid down; as well as re-educating the society about this history and the rights of the aggrieved, to demonstrate their genuine intention to break down this structure of racism in our society.

255.    The Defendants jointly and severally know that failing to make restitution to the Plaintiff *in this circumstance*, as they are obliged to do under national and international Law, is not only proof of the existence of the very "structure of racism" they deny exist, but it is also proof of abuse of power.

256.    The Defendants know that it is abuse of power to use their might and power to avoid restituting those they have harmed in furtherance of unlawful conspiracies, especially when this abuse and avoidance of restitution are clearly based on discriminatory reasons having to do with the race and "color" of the aggrieved, and especially when there is such a huge power differential between the abused people and the abuser.

257.    The Defendants' conspiracy against the right of the Plaintiff to know her identity as well as their obstruction of the Plaintiff's right to know her identity, is tortious because not only have they deprived her of her identity and origin which is fundamentally injurious and *actionable per se*, but their reasons for participating in these conspiracies against the plaintiffs rights, and then refusing to restitute the plaintiffs are race-related, and amount to racial discrimination in violation of the U.S. Constitution, Title 18 Section 241 of the United States Code, the Civil Rights Act, the American Bill of Rights, the English Bill of Rights, the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the UN Charter, the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment , the Magna Carta, the European Convention on Human Rights, the UK Human Rights Act of 1998 and other conventions, laws and legislations.

258.    By reason of the foregoing, the Plaintiff and others similarly situated have been damaged in an amount of $3,000,000,000 USD plus exemplary and other damages to be determined.

**THIRD CLAIM FOR RELIEF**

## Emotional distress

259. The Plaintiff re-asserts and incorporates by reference each allegation in paragraphs 1 through 259, inclusive, as if fully set forth herein.

260. The Defendants have caused the Plaintiff emotional distress by conspiring against the constitutional rights of the Plaintiff and others similarly situated to know their origins and true identities in violation of Title 18 Section 241 of the United States Code.

261. The Defendants both jointly and severally, have caused the Plaintiff emotional distress by conspiring to obstruct the Plaintiff from exercising her right to "petition the Government for a redress of grievances," pursuant to Amendment 1 of the U.S Constitution.

262. The Defendants both jointly and severally have obstructed the Plaintiff by adopting a stance of stalling, tone-deafness, apathy, and callousness to silence the Plaintiff and others similarly situated in and from the Caribbean; and the Defendants have shown a startling indifference to the entreaties and emotional distress of similarly situated plaintiffs for many centuries, thus putting the Plaintiff in a position of fear for voicing her grievances.

263. The Defendants both jointly and severally have discouraged the Plaintiff from exercising her right to petition the government for a redress of grievances by their condonation of the events that led to her loss of identity causing her emotional distress; the Defendants' glorification of the people involved further distresses the Plaintiff; and the Defendants' long-standing position on this issue has had the desensitizing and silencing effect of forcing the Plaintiff and others similarly situated

to expect and accept fewer rights and privileges than others in society and remain

silent in the face of injustice, for fear of reprisal.

264. The Defendants both jointly and severally, have also violated the Plaintiff pursuant to

the United States Constitution at Amendment 4 by subjecting the Plaintiff to an

unreasonable seizure of her identity, and facts about her origin, which, again, causes

her emotional distress.

265. The Defendants both jointly and severally, have further violated the Plaintiff pursuant

to the American Bill of Rights and the United States Constitution at Amendment 5

and Amendment 14 which state that no person shall be "deprived of life, liberty, or

property, without due process of law" or the "equal protection of the law"; nor shall

"private property be taken for public use, without just compensation." By failing to

restitute the Plaintiff and others similarly situated for the deprivation of life, liberty

and property without compensation, the Defendants assure the eternal emotional

distress of the plaintiffs and each new generation of their families.

266. The Defendants both jointly and severally, have deprived and are depriving the

Plaintiff of "life, liberty and property," without due process of law, by depriving the

Plaintiff of her right to know her ethnic identity, familial roots and origin, and by

erasing the Plaintiff's true identity and information about her origin-- which is her

property—without just compensation, and compelling the Plaintiff and others similarly

situated to accept this status as if it is normal, while the Defendants flaunt their

knowledge of their origins.

267. The Defendants both jointly and severally have conspired with others to deprive the Plaintiff and others similarly situated of their identity rights in a manner that is arbitrary, reckless, and negligent, and completely incompatible with the plaintiffs' right to "private life" pursuant to Article 8 of the European Convention on Human Rights as well as the UK Human Rights Act of 1998.

268. The Defendants' actions were arbitrary from beginning to now because no "procedural safeguards of the domestic law in force at the material time" were put in place to preserve the ethnic identities of the Plaintiff's antecedents so that future generations could know who they are and where they come from. (See, e.g., *Usmanov v. Russia* 43936/18 (2020) where the European Court of Justice held: "It followed that the legal framework in force at the material time had fostered an excessively formalistic approach to the annulment of Russian citizenship and had failed to give the individual adequate protection against arbitrary interference.")

269. The Defendants both jointly and severally must have known that their actions would have had long term effects into perpetuity, on millions of people—such as emotional distress--but they have simply refused, quite frankly, to care.

270. The Defendants further cause the Plaintiff emotional distress by refusing to treat the Plaintiff the way they treat other aggrieved persons under similar circumstances. The Defendants ought to acknowledge that given that the European Court of Justice awarded the plaintiff in *Usmanov* pecuniary and non-pecuniary damages for arbitrary interference with his right to identity and nationality, they, too, ought to pay pecuniary and non-pecuniary damages to the Plaintiff and others similarly situated for

unlawful interference with their identity and origin and conspiring against their rights; and the Defendants ought further to admit that the reason they have not awarded compensation to the plaintiffs after all this time is because of the color with which their humanity is coded.

271. The Defendants' arbitrary and discriminatory actions, and the lack of a "legal framework in force at the material time," has meant that the Plaintiff and others similarly situated have not had and do not have adequate protection against arbitrary interference with their right to know their identity and their origin. This lack of adequate protection is itself tortious, indeed it is negligent, and it has had adverse effects on the plaintiffs' ability to unpack her identity, as well as her sense of belonging, their sense of citizenship, and their sense of equality in the global communities in which they live.

272. The Defendants have grotesquely violated the Magna Carta and have caused the Plaintiff and others similarly situated emotional distress as a consequence of this violation.

273. The Defendants have knowingly and intentionally caused emotional distress to millions of people for hundreds of years; and they have been unremorseful. For that reason, all applicable legislations should be applied retroactively in this action in the interest of justice, so that the plaintiffs can restituted for this emotional distress.

274. By reason of the foregoing, the Plaintiff and others similarly situated have been damaged in an amount of $3,000,000,000 USD plus exemplary and other damages to be determined.

**FOURTH CLAIM FOR RELIEF**

Cruel and inhuman treatment

275. The Plaintiff re-asserts and incorporates by reference each allegation in paragraphs 1

through 275, inclusive, as if fully set forth herein.

276. The Plaintiff asserts that the Defendants both jointly and severally, through their

Parliament which is part of the government of England and the United Kingdom,

gave statutory and apparent authority to British subjects (aka de facto employers) to

subject millions of undefended people to cruel and inhuman treatment by enslaving

these individuals even though these individuals had done nothing wrong; and cruelly

erasing the identities of these individuals, so that into perpetuity none of the progeny

of these individuals would know who they are and where they came from; and the

Defendants have made it clear that they do not care about the consequences for

millions of people living today without knowledge of who they really are. This is

cruelty manifest.

277. The Defendants had, and have, an uninterrupted SUPREME duty and authority (aka

parliamentary supremacy) to enact legislation *immediately* upon realizing that British

subjects (aka de facto employers) were routinely harming undefended civilians from

the African continent and depriving these civilians who had done nothing wrong of

not only their freedom, but also their nationalities and individual identities, and also

failing to keep records of their origins, in violation of the 1215 Magna Carta.

However, the Defendants did not get around to fulfilling their duties for over 200

years when, with "royal assent," the parliament finally and casually abolished slavery

in 1833. But the Defendants subsequently and cruelly turned their backs on the injured people after this abolition while financially compensating the wrongdoers, causing the aggrieved emotional distress all over again.

278. The Plaintiff asserts that the Defendants have subjected her, and others similarly situated to cruel and inhuman treatment where their identity rights are concerned, in violation of article 5 of the Universal Declaration of Human Rights and article 7 of the International Covenant on Civil and Political Rights, "both of which provide that no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment".

279. The Plaintiff asserts that the Defendants are aware that it is cruel, inhuman and degrading to force the Plaintiff and others similarly situated to be completely devoid of information about where they came from, and to force the plaintiffs to accept this unique status in the global society—they, being the only group of humans on the Earth who are subjected to this cruel treatment—as if this is normal.

280. The Plaintiff further asserts that the Defendants have treated her, and others similarly situated, as well as their antecedents, cruelly, by refusing to help to re-establish their lost identities and origins, in violation of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, a treaty the Defendants signed in 1988.

281. The Plaintiff further asserts that the Defendants have treated her, and others similarly situated cruelly, in violation of the 1950 European Convention of for the Protection of Human Rights and Fundamental Freedoms.

282. The Plaintiff asserts that the Defendants are signatories of the European Convention for the Protection of Human Rights and Fundamental Freedoms (1950) which at Article 3 prohibits cruel, inhuman and degrading treatment; and which at Article 8 ensures respect for "private life" of each individual. The European Court of Human Rights ruled, pursuant to Article 8 of that convention "that the **right to an identity**, which includes the right to know one's parentage, is an integral part of the notion of private life." See, *Godelli v. Italy* Application No. 33783/09 (2013).

283. The Plaintiff asserts that the Defendants know right from wrong which is why they enacted the UK Human Rights Act (1998) which mirrors the European Convention for the Protection of Human Rights and Fundamental Freedoms (1950); however, the Defendants ignore the fact that millions of people don't know their own identities and origin because of the unlawful and cruel actions of the Defendants. It is as if the Defendants mean to tell the Plaintiff and others similarly situated that they are not covered by these laws.

284. The Defendants have, as recently as 1998, with the enactment of the Human Rights Act—part of the uncodified constitution of England and the United Kingdom—reiterated that the **right to an identity**, which includes the right to know one's parentage, is an "integral part of the notion of private life." It is therefore cruel on the part of Defendant to refuse to help the injured people with re-establishing their identities and origins and information about their parentage.

285. The Plaintiff asserts that the Defendants have violated her right to know her identity and origin in violation of the 1689 English Bill of Rights, which not only established

the rights of parliament and the parliamentary supremacy in England, it also "listed

individual rights, including the prohibition of cruel and unusual punishment."

286. The Plaintiff asserts that the Defendants have violated her rights pursuant to the

English Bill of Rights of 1689 by unlawfully interfering with her antecedents'

identity and origin—with cruel and inhuman acts—and, by association, dispossessing

the Plaintiff of information about her own identity and origin, thus cruelly subjecting

her to degrading social situations where she cannot answer to questions such as "no,

where are you *really* from?" without feeling emotional distress.

287. The Plaintiff asserts that the Defendants ought to know that it is cruel and inhuman to

treat the Plaintiff and others similarly situated as though they have no individuality

and thus arbitrarily deprive millions of people of knowing their individual identities

and information about their origin and expect them to just get over it without offering

a mechanism of healing—such as assisting them with re-establishing their identities.

288. The Defendants knew or ought to have known that it is cruel and inhuman

punishment to kidnap an innocent person who had done nothing wrong, traffic him or

her across vast oceans to distant lands, imprison him or her on plantations where he

or she was forced to work without pay for his or her entire life until death, erase his or

her identity, and then to continue the trend with the children of this individual after

the individual is dead—with the loss of identity going on into perpetuity and

impacting current living generations of this individual's relatives—given that the

Defendants lead a nation of laws, and given that the Defendants wrote the Magna

Carta, the mother of all laws ever written in modern times, and given what the Magna

Carta clearly said and what the Magna Carta clearly stands for.

289. The Defendants knew or ought to have known that depriving someone of their identity in an arbitrary manner when said person has done nothing wrong is cruel and unusual, and utterly and directly contrary to the known laws and statutes and freedom of [English] realm."

290. The Defendants have been callous and remorseless about how much they have injured the Plaintiff, her antecedents, and others similarly situated, and they have treated the Plaintiff and others similarly situated like a monolith with no individuality and no individual rights, and they have treated the plaintiffs as being entitled to a reduced bundle of rights as compared to everyone else in society—especially their perceived binary opposites in society—even with regard to being compensated and restituted for their injuries. This is because of the plaintiffs' association with people the Defendants grotesquely abused without consequence, and the perceived racial identity of the plaintiffs.

291. The Defendants both jointly and severally, have also violated the plaintiffs pursuant to the American Bill of Rights and the United States Constitution at Amendment 8 that prohibits the infliction of cruel and unusual punishments.

292. The Defendants know that it is cruel and inhuman to conspire to erase information about the origins and identities of millions of people and their progeny into perpetuity, while the Defendants insist on knowing their own identities into perpetuity. The Defendants have calculated that they can get away with this cruelty, because neither the UK government nor the monarchy view the Plaintiff and others similarly situated as having *equal rights* to others in society who know their identity.

293. The Defendants are unapologetic about this cruelty.

294. By reason of the foregoing, the Plaintiff and others similarly situated have been damaged in an amount of $3,000,000,000 USD plus exemplary and other damages to be determined.

### FIFTH CLAIM FOR RELIEF

## Violations of the UN Convention on the Rights of the Child and UN State Responsibility for Internationally Wrongful Acts

295. The plaintiff re-asserts and incorporates by reference each allegation in paragraphs 1 through 295, inclusive, as if fully set forth herein.

296. The Plaintiff asserts that Defendants both jointly and severally have violated her rights pursuant to the UN Convention on the Rights of the Child and the UN Draft Articles on State Responsibility for Internationally Wrongful Acts, which, in the view of the Plaintiff, must be retroactively applied in the interest of justice.

297. The Defendants are signatories of the UN Convention on the Rights of the Child having signed that Convention in 1990 and ratified it in 1991.

298. The Defendants have agreed at Article 8 of that Convention to "respect the right of the child to preserve his or her identity, including nationality, name and family relations as recognized by law without unlawful interference."

299. The Defendants have also agreed at Article 8 of that Convention that "where a child is illegally deprived of some or all of the elements of his or her identity, States Parties shall provide appropriate assistance and protection, with a view to re-establishing speedily his or her identity."

300. The Defendants both jointly and severally are aware that the Plaintiff was once a child, and so were countless others in her line of parentage, and that her right to know her true identity (and correspondingly the right of her antecedents to know their identities), was never respected pursuant to Article 8 of the Convention of the Rights of the Child.

301. The Defendants know that they should have provided "appropriate assistance and protection with a view to re-establishing" the identities of millions of people similarly situated to the Plaintiff, but have failed, for centuries, to be open to even apologizing for their actions in a serious, genuine, and official way, never mind fulfilling their duty and obligation to respect Plaintiff's identity rights and helping her and others similarly situated with re-establishing their origins.

302. The Defendants jointly and severally have been categorically opposed to making any restitution at all for these injuries – this includes helping the Plaintiff and others similarly situated with re-establishing their identities, and this is highly unusual given the magnitude of the plaintiffs' injuries and given the type of government and monarchy the Defendants have painted themselves as in the international community.

303. The Plaintiff further asserts that pursuant to customary international law, the Defendants are obliged to pay for the DNA tests demanded by the Plaintiff individually and on behalf of others similarly situated, because their identities and

origins were erased due to the wrongful acts of the Defendants, and the Defendants are obliged to pay for their internationally wrongful acts.

304. The Plaintiff asserts that she and others similarly situated have a private cause of action pursuant to these conventions, against the Defendants, and that the court should recognize a private cause of action against the Defendants in this case in the interest of justice.

305. The Plaintiff asserts that she has a private cause of action pursuant to the UN Draft Articles for State Responsibility for Internationally Wrongful Acts (2001), which states that: "the State responsible for an internationally wrongful act is **under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution**. 2. The compensation shall cover any financially assessable damage including loss of profits insofar as it is established." (Emphasis added).

306. The Defendants have seriously breached their obligations under International Law. They have not "made good by restitution," the damage that has been done to individuals and countries – especially those in the Caribbean where most of the populations are descendants of people who were wrongfully enslaved, and where millions of people still do not know their origins or where they came from.

307. The Defendants know that Africa is not a country, just like Europe is not a country, and as such they know that the Plaintiff has a right to know which country on the African continent, she came from just like every European know which country in Europe they and their ancestors come from.

308. The Defendants know that the Plaintiff and others similarly situated are not a monolith; they are individuals, and they have an individual right to know where they came from.

309. The Defendants know that but for their conduct, and their acts and omissions, the Plaintiff and others similarly situated would know their identity and where they came from.

310. The Defendants jointly and severally are under an obligation to restitute and compensate the Plaintiff and others similarly situated for the injuries they caused, and pay for DNA test for each injured plaintiff, of which it is estimated that there are at least 10 million injured people.

311. By reason of the foregoing, the Plaintiff and others similarly situated have been damaged in an amount of $3,000,000,000 USD plus exemplary and other damages to be determined.

## **PRAYER FOR RELIEF**

312. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial in this action of all issues so triable.

313. Plaintiff further demands: (a)judgment on the first claim for relief, in favor of plaintiff and against the Defendants jointly and severally for $3 billion dollars, and for compensatory damages, emotional damages, exemplary damages and any other damages that this court deems just and proper; (b). judgment on the second claim for

relief, in favor of the Plaintiff and against the Defendants jointly and severally for damages, including $3 billion USD, exemplary damages and any other damages this court deems just and proper;  (c) judgment on the third claim for relief in favor of the Plaintiff and against the Defendants jointly and severally for damages, including $3 billion USD, exemplary damages and any other damages this court deems just and proper;  (d) judgment on the fourth claim for relief in favor of the Plaintiff and against the Defendants jointly and severally for $3,000,000,000 USD and for damages, including exemplary and any other damages this court deems just and proper; (e) judgment on the fifth claim for relief in favor of the Plaintiff and against the Defendants jointly and severally for $3,000,000,000 USD and for damages, including exemplary and any other damages this court deems just and proper; together with the costs and disbursements, including reasonable attorneys' fees, of this action; and such other and further relief as to this Court may seem just and proper.

314. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Plaintiff further requests an order certifying this action as a class action, appointing Plaintiff as class representative, appointing the undersigned counsel as class counsel, and requiring Defendants to bear the cost of class notice as well as all other costs incident to this action – including attorney's fees.

315. Rule 23(a) of the Federal Rules of Civil Procedure permits certification of a class action if:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or

defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the

class.

316. The proposed class satisfy the requirements of Rule 23 (a). Rule 23 of the Federal

Rules of Civil Procedure requires that a certification of a class action suit should be

granted where there is numerosity, commonality, typicality and adequacy among and

between the plaintiffs; and at least one criteria of Rule 23(b) has been fulfilled. See,

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614–15 (1997); See, also See,

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 267 (2d Cir. 2006).

317. The requirement of "numerosity" for certification as a class action is satisfied in this

case. Indeed, the class is so numerous that joinder of all members is clearly

impracticable. It is estimated that the number of plaintiffs whose identities have been

arbitrarily erased by the Defendants could be as many as ten million people – in the

British Commonwealth in the Caribbean proper, and in the diaspora here in the

United States. See, *Cent. States SE & SW Areas Health & Welfare Fund v. Merck-*

*Medco Managed Care, L.L.C.,* 504 F.3d 229, 244-45 (2d Cir. 2007) ("the difficulty or

inconvenience of joining all members of the class make use of the class action

appropriate")

318. The requirement of "commonality" for certification of a class action is satisfied in

this case because a "common issue drives the resolution of the litigation." Indeed, the

plaintiff and others similarly situated have suffered the same injury – their true

identities and information about their origin have been arbitrarily erased by the

Defendants and their subjects, agents and representatives, and this erasure amounts to

an unlawful interference with their right to know their identity and origin. The

expectation that the plaintiffs should accept this status as normal for fear of being

abused in society is manifest injustice. A determination of this case will resolve this

matter in "one stroke" for all parties. See, example, *Sykes v. Mel S. Harris & Assocs.*

*LLC,* 780 F.3d 70, 85 (2d Cir. 2015)

319. Further, the plaintiff's grievances share a common question of law or fact. The

questions presented here are why is a state or government permitted to violate its own

laws and unlawfully interfere with the rights of millions of people by imprisoning

these individuals on their worksites for their entire lifetime -- even though these

individuals had done nothing wrong and had received no due process as is required

by law before their rights were interfered with; permit its citizens to wantonly break

established laws which are in force and effect all in the pursuit of commercial gain at

the expense of the rights of millions of undefended civilian people to be left alone;

arbitrarily erase the identities and origins of millions of undefended civilian people

for hundreds of years in violation of those laws; cause other grievous harm to

millions of undefended civilian people as a consequence of breaking laws which are

in force and in effect; yet, bear no responsibility whatsoever to the injured people for

any of this, including but not limited to assisting with re-establishing the lost

identities of the progeny of these millions of people who, as a consequence of the

unlawful acts of the Defendants, do not know their identities and origin.

320. Even assuming there could be class members with variations on those questions, it

has been well-established that "commonality does not mandate that all class members

make identical claims and arguments, only that common issues of fact or law affect

all class members. A court may find a common issue of law even though there exists some factual variation among class members' specific grievances." *Stinson v. City of N.Y.*, 282 F.R.D. 360, 369 (S.D.N.Y. 2012).

321. The claims of all the putative plaintiffs in this action are typical and thus satisfy the typicality requirement for class certification. "Typicality requires that the claims of the class representatives be typical of those of the class, and it is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. MetroNorth Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001).

322. As required under the Rules, the named plaintiff and the class suffer the same injury and the "unlawful interference was directed at or affected both the named plaintiff and the class sought to be represented." Even assuming there might be members of the class whose individual story contains "minor variations," it will not defeat the fact that typicality is met in this case. See, *Robidoux v. Celani,* 987 F.2d 931, 936-37 (2d Cir. 1993). See also, *In re Glob. Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 452 (S.D.N.Y. 2004).

323. The adequacy requirement is met in this case because there is no question that this attorney will be able and willing to "protect the interests of the class against the possibly competing interests of the attorneys." *Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1077-78 (2d Cir. 1995).

324. The undersigned's interests are identical to the interest of other members of the class. Quite simply, the undersigned would like to know her own identity and roots. Thus,

the question of whether the undersigned's interests are "antagonistic" to the other members of the class is null.

325. As an attorney admitted to practice law in the State of New York since 1999, and in the SDNY since 2001, the undersigned is qualified to represent the class. She is uniquely qualified to handle this case since she is the one who realized this was a cause of action in the first place even though knowledge of the historical facts that led to the cause of action has been documented for 400 years.

326. The undersigned has the time and interest in this case that cannot be matched by any other counsel. She is ready, willing and able to conduct this litigation. See *Baffa v. Donaldson,* 222 F.3d 52, 60 (2d Cir. 2000).

327. The undersigned will "fairly and adequately protect the interests of the class". The undersigned is obviously invested in a positive outcome for all concerned. The undersigned believes that millions of persons have no one to advocate on their behalf on this matter, and she has taken it upon herself to defend their interests.

328. Additionally, the undersigned has the necessary integrity and credibility to "diligently perform her fiduciary duties to the class." *Kurtz v. Kimberly-Clark Corp.,* 321 F.R.D. 482, 535-36 (E.D.N.Y. 2017).

329. In addition to the foregoing, Rule 23(b) has been fulfilled for class certification to be granted. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614–15 (1997).

330. First, prosecuting separate actions by and against individual class members will present a risk of "inconsistent or varying adjudications with respect to individual

class members that would establish incompatible standards of conduct for the party opposing the class." In this case, all the plaintiffs have suffered the exact same injury: their identities and origin have been erased. There is no need for separate actions in this case as this will only lead to inconsistency.

331. Moreover, individual adjudications would "substantially impair or impede the ability of the parties to protect their interests." When, as here, "questions of law or fact common to class members predominate over any questions affecting only individual members," it has been well settled that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

332. For the foregoing reasons, the undersigned requests certification of this suit as a class action; as well as her appointment as counsel in this class action; together with granting of the declaratory and injunctive relief requested; together with awarding of damages sought including the deposit of $3,000,000,000 USD into a trust to be distributed to each affected individual who wants to get a DNA test; together with the costs and disbursements, including reasonable attorneys' fees, of this action to be paid by the Defendants in this action; and such other and further relief as to this Court may seem just and proper.

Dated: New York, New York December 23, 2022

Respectfully Submitted

_____

Marion T.D. Lewis, Esq.